**RESIDENT ADVISORY BOARD et al.**

v.

**Frank L. RIZZO et al.**

**Civ. A. No. 71–1575.**

United States District Court,
E. D. Pennsylvania.

Nov. 5, 1976.

As Amended Dec. 10, 1976.

990

Janet F. Stotland, Harold R. Berk, George D. Gould, Jonathan M. Stein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Charles W. Bowser, Philadelphia, Pa., for Urban Coalition Housing Task Force.

Arthur R. Littleton, Roberta S. Staats, Philadelphia, Pa., for Multicon Properties and Multicon Constr. Corp.; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.

Martin A. Weinberg, City Sol., A. P. Libetti, Philadelphia, Pa., for City of Philadelphia.

Peter A. Galante, Nicholas J. Scafidi, Philadelphia, Pa., for Redevelopment Authority of City of Philadelphia.

Paul Eisenberg, Joseph Mistrano, Harold Cramer, Arthur W. Lefco, Philadelphia, Pa., for the Philadelphia Housing Authority.

Walter S. Batty, Jr., Asst. U. S. Atty., William F. Hall (Regional Director) HUD, Philadelphia, Pa., for defendants.

Joseph M. Gindhart, Krusen, Evans & Byrne, Philadelphia, Pa., for Whitman Area Improvement Council, defendant-intervenors.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

The plaintiffs in this action have brought suit alleging that various defendants have violated the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981, 1982, 1983, 1985 and 1986; the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., as well as·the Fifth, Thirteenth and Fourteenth Amendments to the United States Constitution. The plaintiffs commenced this action in 1971 seeking both injunctive relief and damages against the defendants in connection with their actions or inactions in the proposed construction of a low income public housing project in a White residential area. The Whitman Park Townhouse Project was to be built in South Philadelphia on a site bounded by Porter Street to the north, Oregon Avenue to the south, Front Street to the east, and midway between Second Street and Hancock on the west. (Exhibit P–168). Plaintiffs contend that the failure to build this proposed project violates their rights under the statutes and constitutional amendments enumerated above. Prior to trial, the plaintiffs, with the permission of the Court, dropped all damage claims against the defendants and now seek only injunctive relief. The plaintiffs are asking this Court to enter a sweeping decree which would order the defendants, their officers, agents, employees and any and all other persons acting in concert or participation with them to take all necessary steps to build the Whitman Park Townhouse Project as planned and establish an affirmative program to insure that the occupancy of the Whitman Park Townhouse Project is racially integrated; declare null and void any and all agreements and resolutions which are dysfunctional to the completion of the Whitman Park Townhouse Project; permanently enjoin the Department of Housing and Urban Development (HUD) from dissipating any funds now held in reserve for the purpose of constructing the Whitman Park Townhouse Project; order the City of Phil-adelphia (City), the Redevelopment Authority of Philadelphia (RDA), the Philadelphia Housing Authority (PHA), the Philadelphia City Council, and HUD to appropriate and/or spend any necessary funds to complete the original Whitman Park Townhouse Project, made necessary because of the delay resulting from the defendants' respective unlawful acts; and order the defendants City, RDA, PHA and HUD, in cooperation with the plaintiffs, to present to this Court a comprehensive plan which will remedy the racially segregated public housing system in Philadelphia by increasing as rapidly as possible the supply of housing units in non-racially impacted areas of the City so as to create equal housing opportunities for low income persons. This plan would, according to the plaintiffs, include a broad range of alternatives available to the City for public housing. Finally, the plaintiffs seek from this Court an order directing the defendants to reimburse plaintiffs for all costs and attorneys' fees arising as a direct result of this litigation.

This litigation, which was filed in 1971, has been protracted and vigorously contested by all parties and encompasses a complex and prolonged procedural history. Shortly after the suit was filed, this litigation was stayed by consent of counsel to await the outcome of a suit filed by the Whitman Area Improvement Council (WAIC) in the Philadelphia Court of Common Pleas.[1] In that lawsuit WAIC attempted, unsuccessfully, to halt construction of the Whitman Park Townhouse Project through the judicial process. After a trial in state court which lasted from August 4, 1971 through September 6, 1971, the case was dismissed as moot on March 20, 1974. In 1972, after it became apparent that the Common Pleas Court suit would not dispose of the issues raised in this Federal action, the parties began a discovery process which required constant intervention by this Court. The record in this case now contains over 450 docket entries. The parties, during the course of this litigation, participated in protracted discussions in an effort to bring

1. *WAIC et al. v. Multicon et al.,* No. 1187, July Term, 1971 C.P. Co.

about settlement of this litigation, and although it was generally conceded that additional housing was badly needed in Philadelphia, a settlement never materialized. The non-jury trial of this case commenced on October 7, 1975 and consumed 57 days, finally ending on January 21, 1976. All parties have now filed with the Court proposed findings of fact and conclusions of law with briefs in support thereof, and the matter is now ready for decision.

*The Parties.*

The plaintiffs in this case are individuals claiming to represent a class defined as "all low income minority persons residing in the City of Philadelphia who, by virtue of their race, are unable to secure decent, safe and sanitary housing, outside of areas of minority concentration, and who would be eligible to reside in the Whitman Park Townhouse Project." [2] The only individual named as a plaintiff in the plaintiff's Corrected Second Amended and Supplemental Complaint to testify at trial was Ms. Jean Thomas. Ms. Thomas resides in a scattered site house owned by PHA at 5024 Brown Street in Philadelphia, a predominantly Black area of the City. (N.T. 43–77, 43–78). Prior to moving to the Brown Street address in June of 1971, Ms. Thomas lived at 3855 Mount Vernon Street in Philadelphia, a scattered site house owned by PHA and located in a predominantly Black neighborhood. (N.T. 43–77). Ms. Thomas moved from her home on Mount Vernon Street because of the bad condition of the house.[3] The most serious problem in this house was that water constantly leaked into her basement up to the fifth or sixth step leading to the first floor. This basement water would become stagnant, creating a health hazard for her and her family. (N.T. 43–77). Her present scattered site house also has water in its basement which has destroyed all her personal belongings stored in the basement. (N.T. 43–78, 43–79). In addition, the electric wiring is in poor repair and Ms. Thomas has difficulty heating her second floor front bedroom. (N.T. 43–78). As a result of these problems, Ms. Thomas asked PHA to find her another house in 1971 and was placed by PHA on their waiting list. (N.T. 43–79, 43–83). Ms. Thomas testified that she "would have loved" to live in the proposed Whitman Park Townhouse Project. (N.T. 43–80).[4]

Additionally, there are two organizational plaintiffs in the lawsuit, the Resident Advisory Board (RAB) and the Housing Task Force of the Urban Coalition (Housing Task Force). Both organizations have sued the defendants on behalf of themselves and their members. Ms. Nellie Reynolds is the president and chairperson of RAB and testified on behalf of RAB. (N.T. 43–6). RAB is an organization whose membership includes all those currently living in public housing in the City of Philadelphia. (N.T. 43–6, 43–8, 43–9, 43–10). Currently, there are approximately 120,000 public housing tenants in the City of Philadelphia. (N.T. 43–6). RAB and PHA have signed a memorandum of understanding which enables RAB to effectively advocate the position of all tenants of public housing and to act as a liaison between the tenants, PHA and HUD.[5] (N.T. 43–8, 43–11, 43–12). All ten-

---

**2.** The case was certified by the Court as a class action on behalf of the above defined class on May 8, 1975.

**3.** Ms. Thomas testified that PHA told her that her house on Mount Vernon Street was unfit for human habitation in 1968, after she had a serious problem with water in her basement. (N.T. 43–95, 43–96). Apparently, the house had been constructed over a creek. (N.T. 43–96, 43–102).

**4.** Ms. Thomas never requested a transfer to any particular location, but testified that she wants to live anywhere where it is decent for her and her family. (N.T. 43–83, 43–86, 43–97). Ms. Thomas stated that the only PHA procedure that she was aware of for obtaining other housing was to request a transfer. PHA would then try to find a suitable house for the applicant.

**5.** RAB is concerned with public tenant problems in connection with admission, PHA policy changes, security and police protection, maintenance and the overall condition of public housing in Philadelphia. (N.T. 43–11, 43–12).

ants of public housing in Philadelphia are eligible to become members of the Board. (N.T. 43–8). Also, those who are eligible to become tenants of public housing, regardless of whether they have applied for and are on the waiting list for public housing, are eligible to become members of RAB.[6] (N.T. 43–10). Although people on the waiting list have no vote in RAB elections, RAB has undertaken to represent those on the public housing waiting list. (N.T. 43–65, 43–66). Ms. Reynolds personally has lived in public housing for 35 years and she currently lives in the Johnson Homes project at 2630–D Norris Drive, Philadelphia. (N.T. 43–6, 43–32). Ms. Reynolds testified that she felt that the Johnson Homes project needed modernizing and that if Whitman were built as proposed, she would consider asking to transfer to that project. (N.T. 43–34, 43–35, 43–75, 43–76).

The Housing Task Force is a semiautonomous arm of the Urban Coalition. (N.T. 44–101). The Urban Coalition is described as a partnership of business, labor and community people who have joined together for the purpose of bringing the varied resources of the community together to attack various urban ills, particularly those of minority groups living in the inner city. (N.T. 44–100). The membership of the Housing Task Force is chosen by the Executive Committee of the Board of Directors of the Urban Coalition and the Housing Task Force is empowered to make decisions in connection with housing in Philadelphia without the approval of the Urban Coalition. (N.T. 44–101). There is no requirement that members of the Housing Task Force be either tenants of PHA or eligible for public housing. (N.T. 44–126, 44–127). The Housing Task Force is concerned mainly with improving housing conditions for lower income people, and is therefore concerned with the availability of public hous-

ing for those low income groups. (N.T. 44–106, 44–107, 44–111). The Housing Task Force is also concerned with bringing industrialized housing to Philadelphia and asked the Urban Coalition to become involved in industrial housing. (N.T. 44–111). Therefore, at the time that plans were submitted for public housing on the Whitman site, the Urban Coalition, together with RAB, submitted a proposal to locate industrial housing on the site. The combined RAB and Housing Task Force proposal was rejected. (N.T. 44–111, 44–112). At the time this lawsuit was filed in 1971, of the fifteen members of the Housing Task Force, three members were living in public housing or eligible therefore. (N.T. 44–103). Another newer member of the Housing Task Force was a tenant in public housing until 1975. (N.T. 44–105). As of this date, at least one member of the Housing Task Force is eligible to live in public housing. (N.T. 44–129, 44–132).

The original defendants who were joined when this suit was filed were the then Mayor James H. J. Tate, the City Managing Director Fred Corleto, Multicon Properties, Inc. and Multicon Construction Corporation,[7] who were to be the builders of the Whitman Park Townhouse Project. The local community group opposing the Whitman project, WAIC, was permitted, pursuant to their motion, to intervene as a defendant in the lawsuit. WAIC then joined as third party defendants PHA, RDA and HUD. PHA is created by state statute[8] and is composed of five members, two of whom are chosen by the Mayor of Philadelphia, two by the Controller of the City of Philadelphia, with the four appointed members selecting the fifth.[9] The members serve for staggered five year terms. (N.T. 1–33, 1–34). RDA is also a creature of state statute[10] and all its members are

---

6. Each public housing development elects a representative, and an alternate to a committee, which committee elects the Board. (N.T. 43–6). The Board is 95% Black. (N.T. 43–11).

7. Hereinafter, Multicon Properties, Inc. and Multicon Construction Corporation will be referred to jointly as Multicon.

8. 35 P.S. § 1541 *et seq.*

9. 35 P.S. § 1545(b)(1).

10. 35 P.S. § 1701 *et seq.*

appointed by the Mayor of Philadelphia. (N.T. 1–70).[11]

In 1972, the new Mayor, Frank Rizzo, and the new Managing Director, Hillel Levinson, were joined individually as defendants and were substituted in their official capacities for their predecessors in office, Mayor Tate and Managing Director Corleto. The City of Philadelphia was later added as a defendant, as was RDA. Finally, after extensive discovery had been conducted, PHA and HUD were joined by the plaintiffs as defendants. The Philadelphia City Council was joined as a defendant in the event the Council was needed to insure that the Court could render appropriate relief.

*Facts.*

On June 4, 1956, PHA conducted a public hearing at which various sites were considered for the development of low income housing projects. Citizens and groups from the Whitman area were in attendance at this PHA hearing, some nineteen of which testified and expressed their views on public housing. (N.T. 2–22). After the hearing, PHA passed a resolution selecting a site at Front and Oregon in Philadelphia for the Whitman project. (N.T. 1–81). Also in 1956, the Whitman site was approved as a public housing site by the Philadelphia City Planning Commission. (N.T. 1–84). On February 18, 1957, HUD gave tentative approval to the Whitman site for the development of a conventional public housing project. (N.T. 1–84). An annual contributions contract was executed by HUD on December 6, 1957, in the amount of $8,607,793, approving a development program for Whitman of 476 units and authorizing PHA to begin planning the Whitman project. (N.T. 1–85). Drawings for a high rise public housing project at the Whitman site were submitted to HUD by PHA and were approved by HUD on August 28, 1959. (N.T. 1–85). Condemnation and acquisition of the site by PHA took place during 1959 and 1960, culminating with the award of

demolition contracts on June 26, 1960. This action had the effect of removing some of the Black families who lived on the Whitman site. (N.T. 31–147, 31–148).

On January 12, 1961, a second public hearing was conducted by PHA for the purpose of adding two small parcels of land to the Whitman site, which addition was approved by PHA. (N.T. 1–85, 2–22). Local opposition developed in reaction to the placing of high rise public housing in Whitman and WAIC was formed to oppose the Whitman project as planned. (N.T. 1–85, 2–23).

On October 27, 1963, RDA executed an application to establish the Whitman Urban Renewal Area. (N.T. 2–10). The application sought a federal grant of $3,311,024 and a temporary loan of $5,545,524 (totaling $8,856,548) to carry on the land acquisition, relocation of site residents, demolition and site clearance, site preparation, and rehabilitation or conservation required for the proposed Whitman Urban Renewal Area. (N.T. 2–10, 2–11). The plan included clearing 130 homes, none of which were at the Whitman public housing site, and rehabilitating 2,500 structures. (N.T. 2–11). The Whitman Urban Renewal Plan, dated October 23, 1963, which included the previously established Whitman public housing site, contained no height limitation for public housing within the area. (N.T. 2–11, 2–12).[12] The land use map for the Whitman Urban Renewal Area provides for public housing as the land use for the Whitman site and is the only site in the Whitman Urban Renewal Area designated for public housing. (N.T. 2–13). In 1963, the estimated racial composition of the Whitman Urban Renewal Area was 3,373 White families and 94 non-White families, 21 of which were to be displaced by the urban renewal. (N.T. 2–13). The total amount of all governmental funds expended through RDA in the Whitman Urban Renewal Area from 1963 through April 30, 1975 has been $11,-

11. 35 P.S. § 1705.

12. After passage of the Barrett Amendment in 1964, referred to herein, the plan was amended

to provide for low-rise public housing dwellings. (N.T. 2–12).

178,210.43; of this amount $6,682,686.92 has constituted federal funds from HUD. (N.T. 2–21). RDA, with federal funds from HUD and from other sources, condemned and acquired a total of 101 properties and parcels of land in the Whitman Urban Renewal Area at a total estimated cost of $1,550,075. Between 1969 and 1973, 109 new homes were privately developed and sold for between $25,000 and $30,000, all of which were eligible for FHA-insured mortgages. (N.T. 2–16). There was no opposition by WAIC to these privately developed homes. (N.T. 2–20). From January 1, 1966 until May 1, 1975, Whitman residents, through RDA and with the aid of federal funds, have obtained $2,718,278 in loans and grants to rehabilitate their homes. (N.T. 2–20). A total of 1,123 households have received funds from this program. Over one-fourth of all the households in the Whitman area have benefited from the grant and loan program initiated by RDA. (N.T. 2–21). Further, urban renewal activities in the area have included a wide range of activities benefiting the Whitman area. (N.T. 2–20).

In 1964, after opposition by WAIC had developed to the high-rise design of the proposed Whitman project, a special Act of Congress was passed, known as the Barrett Amendment. (N.T. 1–85, 20–11).[13] Pursuant to the Barrett Amendment, the design of the proposed Whitman project was changed from high-rise to low-rise construction and RDA purchased the Whitman site land from PHA for $1,217,679.59 with the understanding that the land would be conveyed by RDA to a developer for construction, and finally deeded back to PHA for management by it as a low-rise public housing project. (N.T. 1–85, 1–86, 5–58, 5–59, 20–11). The sale of the land to RDA resulted in a writedown of the cost of the land and a change in the zoning of the Whitman site within the Urban Renewal Area to permit low-rise public housing. (N.T. 5–59).

Such a change in the urban renewal plan was approved by City Council on September 2, 1964. (N.T. 1–85).[14] In May of 1967, City Council passed an ordinance approving the purchase of the land from PHA. (N.T. 1–87). In late 1967, Hartsville Construction Company was chosen as a developer to build 114 units on the Whitman site. (N.T. 1–87, 5–18). WAIC opposed certain aspects of the Hartsville plan and Hartsville refused to execute the contract of sale tendered to it on May 2, 1969. (N.T. 1–87, 5–18). Because of the opposition by WAIC to the Hartsville plan, a decision was made to look for a new developer which would develop its own plan and not use the old Hartsville plans. (N.T. 5–19). Also, because the Hartsville plans were not to be used, a "turnkey" developer was obtained. (N.T. 5–21). A turnkey developer differed from a conventional housing developer in that the turnkey developer would purchase the land, hire the architect to design the project, produce the drawing, set a cost for his project and then submit his proposal to the Housing Authority. (N.T. 5–22). The Housing Authority, if it decided to accept a turnkey developer's proposal, would, after appropriate public hearings and approvals, sign a contract with the turnkey developer and HUD, which specified that the turnkey developer would build the project and upon completion turn it over to the Housing Authority for the agreed upon purchase price. The Housing Authority would manage the project and HUD would provide the necessary subsidies. (N.T. 5–22, 5–23).

A HUD Equal Opportunity staff review of the Whitman site was conducted and approval of the site for low income public housing was recommended on June 4, 1968. The Whitman site was described as being located in a predominantly all-White area, conducive in all respects to Equal Opportunity Housing. (N.T. 1–87). Thereafter, HUD approved the Whitman site. (N.T.

**13.** The Barrett Amendment is Section 1007 of the Housing and Urban Development Act of 1964. The Amendment was introduced by the late South Philadelphia Congressman, William Barrett.

**14.** The cost of the writedown by RDA was absorbed in the urban renewal programs of the City, with the aid of federal subsidies from HUD. (N.T. 1–86, 5–59).

1–87). The next year HUD established the Whitman project as a "balance" for the Morton Addition, a project located in a Black area of Philadelphia. (N.T. 1–88).[15] The Morton Addition has been completed and is now occupied. (N.T. 2–4).

During the latter part of 1969, PHA and RDA advertised for turnkey developers for the Whitman site pursuant to all applicable regulations. Twelve developers responded, and on April 28, 1970, PHA chose Multicon as the developer, which choice was approved by HUD on May 20, 1970. (N.T. 2–7, 2–8).[16] The Multicon proposal was considered superior to all other proposals because it maintained existing street patterns and the housing was of the same design as the other houses in the Whitman area. (N.T. 5–25, 5–26, 5–27, 5–28).[17] The Whitman Park Townhouse Project was unique in design for public housing because each house was designed with street frontage and a separate entrance and could be individually plotted on a separate building lot. (N.T. 5–41, 5–47, 5–62, 5–63, 5–64). This design was in anticipation of a federal program called Turnkey III, which called for a lease-purchase agreement pursuant to which the public housing tenant could eventually become the owner of his own home. (N.T. 5–46, 5–48).[18]

On July 14, 1970, RDA and Multicon entered into an agreement of sale to enable Multicon to obtain the land at Front and Oregon and build the Whitman Park Townhouse Project. On October 27, 1970, Mayor Tate signed an ordinance which had been passed by City Council approving Multicon

as the developer of the project. On October 29, 1970, based upon appropriate HUD approval of the project, PHA and Multicon entered into an agreement of sale whereby Multicon was to construct 120 townhouses on the Whitman site. (N.T. 2–8, 2–9, 2–10). On October 30, 1970, RDA conveyed title to the Whitman Park Townhouse Project site to Multicon.

Prior to the signing of the contracts with Multicon, WAIC, which was designated as the local citizen participation unit, for the Whitman Urban Renewal Area, was involved in numerous meetings and correspondence with RDA, PHA and Multicon officials. (N.T. 2–22, 2–25, 2–26). On June 2, 1970, a meeting was held in the Whitman community and was attended by officials from RDA, PHA, Multicon and the Mayor's office. (N.T. 5–60). The meeting was held to give WAIC an opportunity to closely review the Multicon plans for the Whitman Park Townhouse Project. (N.T. 5–61). WAIC made several suggestions in connection with the building materials to be used in the project and fire safety for the completed townhouses. (N.T. 2–26, 5–65, 5–66, 5–68). The suggestions were accepted by those officials in attendance at the meeting and, after investigation, appropriate changes were made in the Whitman Park Townhouse Project plans. (N.T. 5–67, 5–68). Also, the home ownership potential and the advantages thereof of a public housing development under Turnkey III were explained to WAIC. (N.T. 5–70, 5–71, 5–85). WAIC officials stated after the June 2, 1970 meeting that the Whitman Park Townhouse Project plans "look excel-

---

**15.** The "balance" concept was part of HUD's site selection criteria pursuant to Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d. (N.T. 1–88). HUD Equal Opportunity review of the Morton Addition recommended only a qualified approval of the Morton project conditioned upon completion of the Whitman project. (N.T. 2–4).

**16.** By RDA Board resolution, a disposal price of $115,000 was set on the land, which represented the reduced value of the land for the use scheduled in the urban renewal plan. (N.T. 2–8).

**17.** The Whitman Park Townhouse Project was not an apartment style design but was designed as a two story row house development. (N.T. 5–28, 5–38).

**18.** Originally, of course, PHA would own and operate the Whitman Park Townhouse Project. The common areas which PHA would retain control of after the homes were purchased by public housing tenants were kept to a minimum. (N.T. 5–48). Tenants would take on maintenance responsibilities to build up "sweat equity" to enable them to make a down payment and eventually to own their homes.

lent", that WAIC was "very impressed with the plans" and that WAIC felt that the houses would be "an asset to our community." (N.T. 2–26, 2–27).

On January 28, 1971, the president of WAIC, Alice Moore, wrote to RDA in connection with the Whitman Park Townhouse Project: "We . . . do not feel that all of our questions have been thoroughly answered." (N.T. 2–32). On March 22, 1971, two PHA representatives attended a WAIC meeting to answer community questions about the project. At the same meeting, Fred Druding was elected as the new president of WAIC and a decision was made to demonstrate the next morning in opposition to the Whitman Park Townhouse Project. (N.T. 2–33).

Although a groundbreaking ceremony was conducted on December 16, 1970, actual construction did not commence until March of 1971. At 7:30 a.m. on March 23, 1971, approximately thirty women entered the Whitman site and gathered around a bulldozer and backhoe, blocking the operations of the contractor and refusing to leave the area when requested to do so. (N.T. 2–33, 2–34). On that same day, demonstrators at the Whitman site blocked a truck attempting to make a delivery to the Whitman Park Townhouse Project. (N.T. 2–34). Again, on March 25, 1971, demonstrators refused to permit a bulldozer to be operated on the Whitman site. (N.T. 2–34). As a result of these activities, Multicon filed a complaint in the Court of Common Pleas of Philadelphia County seeking injunctive relief to permit it to continue with the construction of the Whitman project. (N.T. 2–34, 3–10, 3–11). Pursuant to the complaint filed by Multicon, a preliminary injunction was issued on April 2, 1971, enjoining further interference with the construction of the project. (N.T. 2–35, 3–9, 19–7). On April 6, 1971, a meeting was held in the chambers of the Honorable Ned Hirsch, the Judge assigned to the Multicon case, to determine whether the preliminary injunction issued to Multicon should continue in effect. (N.T. 3–16, 3–17). The preliminary injunction was continued in effect with the consent of all parties until April 30, 1971. (N.T. 2–35). However, all attempts by Multicon to return to work at the site proved futile. (N.T. 2–35, 2–36, 2–39, 2–77, 2–78, 3–32, 3–33, 3–38, 3–39, 19–8, 19–9). On several occasions Multicon asked the Philadelphia police for aid in enforcing their injunction against interference with construction but were told that it was up to the Sheriff's office to enforce injunctions and that the Philadelphia police were not going to interfere by making arrests unless specifically requested by the Sheriff to do so. (N.T. 19–13, 19–16, 19–17). On April 26, 1971, Multicon obtained a writ of assistance from Judge Hirsch. (N.T. 3–36). On April 30, 1971, Multicon agreed, after a conference in Judge Hirsch's chambers, to the issuance of an order prohibiting Multicon from returning to work pending the outcome of negotiations between the parties. (N.T. 3–39, 3–40). At the conference on April 30, 1971, City Managing Director Corleto stated that Multicon would not receive police assistance. (N.T. 3–40).

Shortly thereafter, there were a series of meetings between WAIC, PHA and Multicon. (N.T. 2–78, 3–41, 3–42, 10–39). Various changes in the Whitman Park Townhouse Project were proposed to WAIC in order to settle the controversy, including opening a building in the project as a community recreation area, reserving 50% of the units for persons who were displaced by the clearance for the Whitman project, raising the income levels of those persons who would be eligible for the project and setting up a screening committee, which would include Whitman residents, to assure that those living in the project would be an asset to the community. (N.T. 3–45, 10–43, 10–44, 10–45, 10–46, 10–47). On May 17, 1971, after full discussion and consideration of the settlement proposals, WAIC voted down the final settlement offer of PHA. (N.T. 2–89, 3–45, 3–46). On May 18, 1971, Mayor Rizzo was nominated as the Democratic candidate for Mayor. (N.T. 3–53). On May 20, 1971, a meeting was held in Judge Hirsch's chambers to consider a request by Multicon that the court's order of April 30, 1971 be lifted and that Multicon be permit-

ted to return to work on the Whitman Park Townhouse Project. (N.T. 3–55, 3–56, 19–21, 19–24, 19–25). At the May 20th meeting, Managing Director Corleto stated that the City would not provide police assistance for Multicon should it return to work. (N.T. 3–57, 19–26 to 19–28). Mr. Gordon Cavanaugh, Chairman of PHA, stated to those present at the meeting that he had been instructed by Mayor Tate to order Multicon not to resume work. (N.T. 2–91, 3–59, 19–26, 19–34, 19–36). Judge Hirsch then signed an order permitting Multicon to return to work. However, faced with a threatened lack of police assistance, Multicon decided that it would not then return to work. (N.T. 19–38). On June 3, 1971, Multicon approached HUD in Washington, D.C. and sought assistance from HUD in building the Whitman Park Townhouse Project. (N.T. 3–69, 10–73). Multicon requested HUD to exert whatever pressure it could upon the City to get the City to cooperate in building Whitman. (N.T. 3–69, 10–73). However, a HUD official in Washington, D.C. stated that HUD did not want to take any action until after the November, 1971 election in Philadelphia. (N.T. 10–74 to 10–76).[19]

On July 14, 1971, Judge Dwyer of the Court of Common Pleas of Philadelphia County issued a permanent injunction against further interference with Multicon's construction at the Whitman site in the case of *Multicon v. WAIC*, No. 4515 (March Term, 1971, C.P. Phila.) (N.T. 3–80 to 3–81). On that same day, WAIC filed a lawsuit against Multicon, *WAIC v. Multicon*, No. 1187 (July Term, 1971, C.P. Phila.), seeking to halt further construction at the Whitman site. Trial of this lawsuit commenced on August 4, 1971 and continued through September 6, 1971. (N.T. 9–92 to 9–93).

In the early part of April, 1971, when Multicon encountered difficulties with con-

tinuing the construction at the Whitman site, Lieutenant Fencl of the Civil Disobedience squad of the Philadelphia Police Department, who had been present at the site during the demonstration, suggested that it might be helpful if Multicon placed a fence around the site, even though the original plans did not call for such a fence. (N.T. 19–39, 19–40). Multicon contacted the Philadelphia Department of Licenses and Inspections to determine what permits were required to construct a fence and was informed that no license or permit was required. (N.T. 19–40, 19–41). Multicon then contacted the Department of Streets and submitted two plans for a fence around the Whitman site. (N.T. 19–42). Multicon was told to submit a written request to the Department of Streets. Thereafter, Multicon was given oral and written permission[20] to build a fence which would close off Howard and Hancock Streets, two small streets which ran only through the Whitman site, but which would keep a through street, Shunk Street, open. (N.T. 9–93, 19–49, 19–52, 19–54, 48–54). Multicon proceeded to construct a plywood fence around the construction site which was torn down by persons unknown on the night of July 5, 1971. (N.T. 9–93, 19–55 to 19–56). The policeman patrolling the area saw no one tearing down the fence. (N.T. 19–56). Thereafter, Multicon engaged a contractor to build a chain link fence with metal posts in place of the plywood fence which had been destroyed. Construction of the chain link fence began on or about August 31, 1971. (N.T. 19–58). On September 1, 1971, Multicon received a violation notice from the Department of Streets in connection with the fence and was ordered to cease construction and to remove the fence. (N.T. 9–96, 19–59). Multicon was told that the fence could not be placed on the sidewalk. (N.T. 19–61). Later in the day of

**19.** Multicon also sought assistance from the regional HUD office in Philadelphia. One local HUD official suggested that HUD stop the flow of HUD money to Philadelphia until the City cooperated in the construction of the Whitman Park Townhouse Project. No action was ever

taken in connection with the suggestion. (N.T. 10–76 to 10–77, 10–79 to 10–80).

**20.** Written permission was given by the Department of Streets on April 29, 1971. (Exhibit P96–10).

September 1, 1971, WAIC picketed the fence subcontractor at his home in Delaware County. (N.T. 9–96). On September 2, 1971, Mr. Marrara of the Street Department went to the Whitman site and told Multicon that they would have to remove the fence from the sidewalk. (N.T. 48–53). Mr. Marrara testified that when he went to the Whitman site he assumed that a permit had been issued to Multicon to build a fence, although he had not seen the permit. (N.T. 48–67, 48–82). He also told Multicon that they could not close off Hancock and Howard Streets with their fence. (N.T. 9–96, 9–97, 19–64) Hancock and Howard Streets were both small streets which were completely enclosed within the Whitman site and on which there was no traffic, either vehicular or pedestrial.[21] (N.T. 19–64, 48–75). Within one-half hour of Multicon's refusal to remove the cemented fence posts, a city work crew with jackhammers was on the scene and, at Mr. Marrara's direction, removed the fence posts. (N.T. 19–65 to 19–66). On September 3, 1971 Multicon received two additional notices from the Department of Streets. One ordered Multicon to remove its construction equipment, mobile homes, materials and debris from the bed of legally open streets, i.e., Howard and Hancock Streets. (N.T. 19–66). All of Multicon's construction equipment referred to in the notice had been on the Whitman site since April of 1971 and was located on the streets so that the equipment would not interfere with the construction of the houses on the other areas of the site. (N.T. 19–67, 19–68). The second notice required Multicon to construct concrete sidewalks adjacent to all streets around and through the Whitman site. (N.T. 19–69). Many of these sidewalks, particularly on Howard and Hancock Streets, were in bad repair when Multicon began construction in March of 1971 and were in the same condition when Multicon received its notice in September of 1971. (N.T. 22–45, 22–63, 48–61, 48–62). The

damage to the sidewalks had occurred when PHA had cleared the Whitman site. (N.T. 22–52 to 22–53). Further, the City had agreed with Multicon prior to commencement of construction that the City would repair the sidewalks adjoining the Whitman Park Townhouse Project. (N.T. 22–52, 22–53). Nevertheless, Mr. Marrara took the position that Multicon, as owner of the land, was responsible for the sidewalks. (N.T. 22–53). Finally, Mr. Marrara did agree to allow Multicon, during construction on the site, to merely blacktop the sidewalks so that equipment could operate in the area. (N.T. 22–54). Mr. Marrara stated that he only enforced the requirement that all City streets be kept open and that sidewalks be fully repaired when someone had made a complaint in connection therewith, as had been done in this case. (N.T. 22–55, 22–56).[22] Mr. Marrara stated that he was requiring Multicon to comply in this case because it was a center of controversy. (N.T. 22–64, 48–58 to 48–60). Further, Mr. Marrara admitted that the City generally did not enforce the fence regulations in connection with high rise construction, although there was no distinction between sidewalks around high rise and low rise projects made in the City Code. (N.T. 22–56). Finally, on September 3, 1971, after a conference with Multicon and the First Deputy City Solicitor, John McNally, the Department of Streets agreed that Multicon could erect its fence around the site precisely in the location from which the Department of Streets had previously removed it. (N.T. 22–69, 22–70). Multicon submitted a written request for a permit to construct this agreed upon fence on September 3, 1971. (Exhibit P96–10). Mr. Marrara gave written approval for the fence on September 9, 1971, stating that "At no time will any permanent barricade or fence be allowed on any . . . legally open street." Exhibit P96–11, (N.T. 48–57). The permit was also conditioned upon

---

21. The Whitman site had, at this point, been vacant for about ten years.

22. Mr. Marrara never received a complaint in connection with the trailer and construction equipment which were on Hancock and Howard Streets. (N.T. 48–102).

Multicon maintaining the footways in the area. (Exhibit P96–11).

On September 10, 1971, Multicon attempted to resume its construction of the fence but was ordered by the Department of Streets to stop until all the sidewalks were blacktopped. (N.T. 9–98). However, when the paving contractor arrived at the Whitman site, he was asked by the residents picketing along the street not to work and he honored their request. (N.T. 9–98, 22–74, 22–78). Finally, on September 14, 1971, the City ordered the construction of the fence to cease because the sidewalk was not being repaired. (N.T. 9–98). The chain link fence was never built by Multicon. (N.T. 22–77, 22–78).

Throughout Mayor Rizzo's campaign for Mayor in 1971, both during the primary campaign and the general election, he publicly took the position that within the framework of the law, he would support local communities in their opposition to public housing projects proposed for their neighborhoods. (N.T. 42–75, 42–77). Mayor' Rizzo testified that, "I had a strong feeling when I ran for election, it was crystal clear, that I would preserve the neighborhoods of the City at any expense . ." (N.T. 42–82). During his campaign, Mayor Rizzo visited Seafarer's Hall in the Whitman area, and publicly pledged his support to the community in opposition to the proposed Whitman Park Townhouse Project. (N.T. 44–77). On that same day, he placed a personal telephone call to Fred Druding, the president of WAIC, pledging his support to WAIC in their opposition to the Whitman project. (N.T. 42–76, 42–77). Mayor Rizzo further testified that he did not know what type of public housing was planned for the Whitman area, and that the particular type of public housing proposed for an area did not influence his decision to support the local community in its opposition to a housing project. (N.T. 42–79). The only consideration was whether the community supported the project or op-

posed it and he would support that community. (N.T. 42–79). Moreover, in considering whether to support or oppose a particular public housing project, Mayor Rizzo testified that he did not consider the racial effect of his community support. (N.T. 42–83). While stating that "there is a possibility that it might affect the minorities, that they might be short-changed . . .", he said that such an adverse racial impact would not change his position in support of the local community. (N.T. 42–83, 42–84).

After Mayor Rizzo's election in November of 1971, he had several meetings with James Greenlee, who was at that time both general counsel for RDA and Chairman of PHA. In November of 1971, Mr. Greenlee, as general counsel for RDA, gave a legal opinion to RDA, which was subsequently forwarded to HUD on November 23, 1971, that all required procedures had been followed in the planning and development of the Whitman Park Townhouse Project, and that no further public hearings were necessary. (N.T. 9–99, 14–18).[23] After Mayor Rizzo was elected Mayor in November, 1971, but before he took office in January, 1972, Mr. Greenlee, as Chairman of PHA, met with Mayor Rizzo to discuss the housing program in the City of Philadelphia. (N.T. 14–23 to 14–25). Mr. Greenlee testified that the Mayor's support was necessary to develop any type of housing program in order to assure passage of the necessary ordinances before City Council. (N.T. 14–26). After discussion of the proposed public housing plans, Mayor Rizzo expressed disfavor as to the sites proposed. (N.T. 14–47). Mayor Rizzo stated that he considered public housing to be the same as Black housing in that most tenants of public housing are Black. (N.T. 14–47). Mayor Rizzo therefore felt that there should not be any public housing placed in White neighborhoods because people in White neighborhoods did not want Black people moving in with them. (N.T. 14–47). Furthermore, Mayor

---

23. The request for legal opinion was made to Mr. Greenlee by Walter D'Alessio, Executive Director of RDA, because of statements made in Federal Court by Levy Anderson, Esquire, City Solicitor for Philadelphia, that all proper procedures had not been followed in connection with the Whitman Park Townhouse Project. (N.T. 14–21).

Rizzo stated that he did not intend to allow PHA to ruin nice neighborhoods. (N.T. 14–47, 14–48). After Mayor Rizzo took office in January of 1972, he told Mr. Greenlee that because of the promise he had made to the people of South Philadelphia in the Whitman project area, he did not want to build the Whitman Park Townhouse Project and asked Mr. Greenlee, as Chairman of PHA, to prevent the building of the project. (N.T. 14–49). The Mayor wanted Mr. Greenlee to obtain passage of a resolution by PHA declaring Multicon in default and the contract between PHA and Multicon void. (N.T. 14–54, 14–55, 14–59). Mr. Greenlee informed Mayor Rizzo that cancellation of the Whitman Park Townhouse Project would require paying Multicon for its losses and would jeopardize federal funding for the City, particularly in view of the fact that Whitman had been designated as a "match" for the Morton Addition project. (N.T. 14–50, 14–52, 14–53, 14–59). Mr. Greenlee suggested that Mayor Rizzo try to obtain a compromise in connection with the Whitman project but Mayor Rizzo stated that a compromise was not possible because the people in the area felt that Black people would be moving into the area if public housing were built. (N.T. 14–55, 14–56).[24] Mayor Rizzo then stated to Mr. Greenlee that the Whitman Park Townhouse Project would not be built. (N.T. 14–62). Mr. Greenlee, when faced with this statement from the Mayor, informed Mayor Rizzo of what is referred to as the Phillips Amendment.[25] (N.T. 12–9, 14–63). This statute provided that a municipality could cancel a public housing project if in the case of Philadelphia, City Council had a public

hearing in connection with the proposed cancellation and passed a resolution revoking the original authorization for the project, and agreed to repay HUD all the money it had advanced for the project and settle any claim for damages by the builder. (N.T. 14–64, 14–65). Mayor Rizzo stated that although the cost to the City of Philadelphia of using the Phillips Amendment to terminate the project was no obstacle to its use in this case, the public hearing required by the Amendment would bring Black people to City Hall to protest the proposed cancellation and hence was an unacceptable procedure. (N.T. 14–65).

During the early part of 1972, there were numerous meetings between Multicon and the new Deputy Mayor Philip Carroll, who had been assigned by Mayor Rizzo to the problems surrounding the Whitman Park Townhouse Project. (N.T. 12–15, 24–3).[26] Mr. Carroll, during these meetings, told Multicon that the City did not want the Whitman project built. (N.T. 10–83). During this period, Mr. Carroll was pressed by WAIC to support their opposition to the Whitman Park Townhouse Project. (N.T. 24–15, 24–16, 24–53).

On May 25, 1972, Multicon again sought help from HUD to exert pressure on the City in connection with the building of the Whitman Park Townhouse Project. (N.T. 4–62).[27] Multicon requested that HUD take over the Whitman project. (N.T. 4–63). However, HUD stated that it was not its policy to take over projects and Multicon felt that HUD, although sympathetic, was not going to be of assistance in completing the project. (N.T. 4–63).[28] Therefore, Mul-

24. Mayor Rizzo felt that most of the people who would move into the Whitman Park Townhouse Project would be Black and that Whitman was a White neighborhood. (N.T. 14–57).

25. P.L. 176, 83d Cong., 67 Stat. 298, 306.

26. Mr. Carroll testified that, although he had daily personal meetings with Mayor Rizzo, the Mayor never enunciated his policy in connection with the Whitman Park Townhouse Project to him, and all he knew about the Mayor's policy in connection with the Whitman

project was what he read in the newspapers. (N.T. 24–4, 24–13, 24–14).

27. Counsel for Multicon met in Washington, D.C. with David Maxwell, general counsel for HUD. Multicon sought help from HUD in either getting construction of the project completed or bringing the project to a halt and allow Multicon to get out as well as it could. (N.T. 4–62).

28. Prior to this time, Multicon had in April of 1972 sought HUD assistance with the Whitman project from the HUD regional office. Multi-

ticon told HUD that they would return to Philadelphia and commence construction of the project. (N.T. 4–63).

On April 28, 1972, RDA passed the following resolution, numbered 7973:

RESOLUTION AUTHORIZING ACTION RE: DEFAULT.

BE IT RESOLVED, By the Redevelopment Authority of the City of Philadelphia that General Counsel is authorized to take such action as may be necessary in connection with any default between Multicon Properties, Inc., provided, however, there is a representation from the Philadelphia Housing Authority of the default in its Contract for development of housing in the Whitman Redevelopment area, Whitman Urban Renewal area.

PHA never made a representation of default to RDA. (N.T. 12–16). However, on April 28, 1972, the same date as the above RDA resolution was passed, PHA Board Chairman James Greenlee wrote to Francis Meyer, former Director of RDA, informing RDA that Multicon would be in default of its contract with PHA on April 29, 1972, as follows:

This is to notify you that on April 29th Multicon Properties, Inc., will be in default in its agreement with the Philadelphia Housing Authority in regard to the parcel owned by Multicon and the Whitman Urban Renewal Area. The agreement was entered into on October 29, 1970, and Article IV, Section A, on Page 4, commits Multicon to complete its obligations within 18 months.

Multicon has not only failed to meet its obligation, but has given the Authority no indication of when, if ever, it intends to resume building. (N.T. 12–6, 12–7, 14–66).[29]

On June 15, 1972, Multicon wrote a letter to Deputy Mayor Phillip Carroll stating that it intended to resume construction of the Whitman project on Monday, June 26, 1972. (N.T. 12–17, 4–64). This letter was sent by Mr. Carroll to Chief Deputy Solicitor, Sheldon Albert, Esquire. (N.T. 12–17). Mr. Albert, after receiving the Multicon letter from Mr. Carroll, prepared an equity action seeking a preliminary injunction against Multicon's resumption of work on June 26, 1972. The action, captioned *City of Philadelphia v. Multicon Properties, Inc., Multicon Construction Corp.,* No. 3538 (June Term, 1972, C.P. Phila. Co.) was filed and docketed at noon on June 22, 1972. (N.T. 12–21). On that same date, Judge Hirsch, pursuant to the motion filed by Mr. Albert on behalf of the City, granted the City an *ex parte* five-day preliminary injunction, stopping Multicon from commencing construction on Monday, June 26, 1972, pending a hearing on June 27. The complaint, filed at noon on June 22, 1972, alleged that the commencement by Multicon of construction would "necessarily result in open and forcible conflict and will threaten the peace, welfare and stability of the community and the City" and stated that:

The defendants, further, have no legal right to construct. Its contracts and agreements with the Redevelopment Authority of the City of Philadelphia and the Philadelphia Housing Authority have terminated with defendants' failure to complete construction within eighteen months of the date of said contracts and agreements, which date has long passed, *as the Redevelopment Authority this date has so stated. Further, said contracts and agreements were void ab initio, not having been the subject of community consultation as required by law.* (N.T. 12–21, 12–22). (Emphasis supplied).

Also, on the morning of June 22, 1973, at about 10:00 a.m., the attorney for RDA in the then pending litigation, captioned *WAIC v. Multicon,* petitioned Judge Dwyer to withdraw from the jointly proposed Findings of Fact, Conclusions of Law and

---

con asked HUD to cut off federal funding to Philadelphia under the workable program. However, HUD stated that it would not follow that course of action for political reasons. (N.T. 35–43, 35–45).

**29.** Mr. Greenlee testified that the resolution was passed in an effort to get Multicon to proceed with the project in spite of its problems therewith. (N.T. 14–68, 14–69, 14–70).

Brief which had been filed on behalf of PHA, RDA and Multicon. The petition was granted on June 28, 1972. (N.T. 12–22). The papers filed by the defendants had sought a finding by the Court that all the requirements with regard to citizen participation in connection with the Whitman project had been met, a position consistently maintained by RDA throughout the litigation. At the RDA meeting held on June 22, 1972, which began at 2:30 p.m., RDA passed resolution 8058 which reads as follows:

> Be it resolved by the Redevelopment Authority of the City of Philadelphia that the contract entered into by and between Multicon Properties, Inc., and the Redevelopment Authority of the City of Philadelphia is *hereby declared to be void ab initio due to the lack of community participation in the decision-making process* as required under the various decisions of the U.S. Supreme Court, or, in the alternative, said contract presently in existence between the Redevelopment Authority and Multicon Properties, Inc., is declared to be in default, which contract became effective on July 14, 1970.
>
> Be it further resolved that counsel duly designated by the Redevelopment Authority be authorized to pursue all legal remedies available to the Authority in order to enforce the rights of the Redevelopment Authority in accordance with the terms of the aforesaid contract. (N.T. 12–23, 4–67).[30] (Emphasis supplied).

Deputy Mayor Carroll stated that the passage by RDA of the June 22, 1972 resolution was not a surprise to him because he had reviewed the resolution beforehand. He was also informed almost immediately after the June 22, 1972 meeting, first by Deputy to the Mayor Michael Wallace, and then by RDA Executive Director Walter D'Alessio, that there was a problem with the Resolution as drafted and submitted to RDA. (N.T. 24–97, 24–103, 24–107). Finally, on the evening of June 22, 1972, Michael Wallace, a Deputy to the Mayor appeared at a WAIC meeting and explained the position of the City in connection with the Whitman project and the RDA resolution of that day. (N.T. 12–24).

On June 27, 1972, Multicon filed a counterclaim in the equity action filed by the City, seeking $1.5 million for the alleged tortious interference by the City with Multicon's contracts to build the Whitman Park Townhouse Project. (N.T. 4–87, 12–29). On or about July 4, 1972, Dr. F. Bruce Baldwin, Chairman of the RDA Board, received a letter from William B. Patterson, HUD area director, who stated the position of HUD in connection with the June 22, 1972 RDA resolution. Mr. Patterson stated that "Such action is highly improper and an action that cannot receive our concurrence," and set forth the requirements for terminating an approved housing project under the Phillips Amendment. (N.T. 12–29).

On July 5, 1972, Mayor Rizzo wrote to John Whitaker, Deputy Assistant to the President for Domestic Affairs in the White House, as follows:

> Many thanks for taking the time to discuss the difficulties that the City of Philadelphia is currently experiencing with the Area Office of the Department of Housing and Urban Development.
>
> As I mentioned to you on the telephone this morning, I am sending you additional information regarding two of the most pressing problems involving two housing proposals which HUD is attempting to foster on unwilling communities.
>
> It would appear that HUD is a prime example of carrying out a successful operation even though the patient may die as a result.
>
> The two programs in question are:
>
> 1. Whitman Park—a Turnkey III Public Housing Project.
>
> 2. Morrell Park—an apartment proposal under Section 236.
>
> Both of these proposals have met with violent opposition and demonstrations by

---

**30.** The Multicon contract is the only contract which RDA has ever declared to be void *ab initio,* and, although requested by the plaintiffs, RDA has not supplied the names of the "various decisions of the U.S. Supreme Court" referred to in the resolution. (N.T. 12–24).

the communities involved. In each case, the opposition stems from the quality of the proposed housing, which would downgrade the neighborhoods.

The Whitman controversy appeared to be finally settled when the Philadelphia Redevelopment Authority canceled the contract with the builder, Multicon Properties, Incorporated. HUD however, is seeking in Federal Court to force construction of the project, much to my dismay, and has threatened other possible sanctions against the City as shown in the attached letter received today from William Patterson, HUD Area Director.

Although Patterson states in his letter that he seeks to protect the interest of the taxpayers, it would appear that he is doing exactly the opposite.

\* \* \* \* \* \*

The City Administration has a recognized responsibility to the people of Philadelphia and can not shield itself behind any bureaucratic regulations, as in the case of certain HUD officials who apparently are unmindful of our problems and the practical realities of urban government.

I most certainly will appreciate any help you can give in these two cases and, again, many thanks for your cooperation. (N.T. 12–30, 12–31, 12–32).

Shortly thereafter, HUD's general counsel, David Maxwell, Esquire, gave instructions by telephone to HUD Regional Director Theodore Robb to keep a "low profile" in the Whitman controversy. (N.T. 12–32, 12–33).

Following receipt from HUD of the Patterson letter, the RDA director and executive director consulted with Leon Katz, Director of the RDA Legal Division, who had not participated in the drafting of the June 22, 1972 resolution (N.T. 12–33). As a result of the conference, the following resolution, No. 8061, was drafted to amend the June 22, 1972 resolution, and was adopted at a special RDA meeting held on July 12, 1972 at 2:15 p. m. (N.T. 12–33, 4–74).

Be it resolved by the Redevelopment Authority of the City of Philadelphia that Resolution No. 8058, adopted by the duly constituted Board of the Redevelopment Authority on June 22, 1972, is hereby amended to read as follows:

Be it resolved by the Redevelopment Authority of the City of Philadelphia that Multicon Properties, Inc., is hereby declared to be in default of a contract presently in existence by and between the Redevelopment Authority and Multicon Properties, Inc. (redeveloper), which contract became effective on July 14, 1970.

Be it further resolved that counsel duly designated by the Redevelopment Authority be authorized to pursue all legal remedies available to the Authority in order to enforce the rights of the Redevelopment Authority in accordance with the terms of the aforesaid contract. (N.T. 4–74, 12–33).

After passage of the June 22, 1972 RDA resolution, Multicon informed the City, RDA and PHA that it would not resume construction because it felt it had an obligation to mitigate the damages it was seeking as a result of the resolution and the City's equity action. (N.T. 4–68 to 4–71, 35–52). RDA, with the exception of one member of its Board, did not consider the racial effect of its two resolutions dated June 22, 1972 and July 12, 1972, but maintains that it has no responsibility to consider such racial impact. (N.T. 12–35). After passage of the July 12, 1972 resolution, Multicon sought by letter on July 25, 1972 advice from RDA as to whether it should seek to cure its alleged default under its contract with RDA. (N.T. 4–78 to 4–81, 12–34). Multicon received no instructions from RDA as to whether RDA then desired Multicon to proceed to cure any default, but its July 25 letter was responded to by Mr. Katz of RDA on July 28, 1972, and Mr. Katz expressed a willingness to meet with Multicon in order to explore the possibility of an amicable settlement. (N.T. 8–5, 8–6). Settlement negotiations continued between Multicon and the City in connection with Multicon's counterclaim in the City's equity action against Multicon. (N.T. 35–58). The action was finally settled on December 14, 1972 by the City agreeing

to pay Multicon $806,000. (N.T. 4–89, 12–36).

According to HUD, there is presently available the sum of $3.68 million for the construction of the Whitman Park Townhouse Project as planned. (N.T. 12–74).

*Whitman Demonstrations.*

The opposition to the Whitman project took the form of mass demonstrations at the project site led by WAIC. Frequently, demonstrators would surround a piece of construction equipment and prevent the workmen from operating the equipment. Demonstrators also prevented trucks from making deliveries to the area. (N.T. 21–10, 21–13, 3–83, 49–101). Some of the demonstrators engaged in name calling, obscenities, threats, and the use of racial slurs. (N.T. 21–10, 21–13, 49–126, 49–130, Exhibit P–91). Other demonstrators stated that they did not want their neighborhood exposed to the type of people who would move into the proposed public housing. (N.T. 21–16, 29–72, 29–75, 33–109, 33–110, 33–118, 33–121, 54–21).[31] A few demonstrators expressed their opposition to the Whitman Park Townhouse Project on the basis that it would bring Blacks into the neighborhood and destroy the racial homogeneity of the area. (N.T. 18–67, 18–68, 18–84, 28–13, 28–14, 28–15, 28–85, 54–183, 54–184, 54–188, 42–18, 42–22). The residents and members of WAIC who opposed the Whitman Park Townhouse Project publicly stated their opposition thereto on the basis that public housing projects are unsafe, unsanitary, lead to increased crime or that the proposed residents of the Whitman project were go-

ing to receive something for nothing, which members of WAIC were unable to receive because of their higher incomes. (N.T. 54–21, 56–10, 56–11).

*Racial Composition of the City of Philadelphia.*

The City of Philadelphia is today a racially segregated city. (N.T. 31–74, 31–75, 50–67).[32] Moreover, 95% of the people on the waiting list for public housing in Philadelphia are of minority background, 85% being Black while 10% are from other minority groups. (N.T. 31–127). Since the close of the 19th century, a significant percentage of the population of the City of Philadelphia has been Black. (N.T. 31–42, 31–43).[33] During the early 1900's, however, the Black population of Philadelphia was widely distributed throughout the City. (N.T. 31–43, 31–44, 31–49, Exhibit P–142A). With the advent of World War I and a greatly increased migration of Blacks to the industrialized cities, the Black population became concentrated in certain defined areas of the City. (N.T. 31–46, 31–63). By 1939, the Black population was concentrated in three areas of the City, North Philadelphia (the area just north of Center City), West Philadelphia, north of Market Street, and South Central Philadelphia (immediately south of Center City toward the Schuylkill River). (N.T. 31–56, Exhibits P–143, P–144).[34] At the same time, the Black population in Philadelphia decreased in the Northeast, the Northwest, the Southwest and the Southeast sections of the City. The area comprising the Whitman project observed a decline of about 300 in its Black population be-

---

**31.** Statements made by Whitman residents and WAIC members often referred to residents of public housing as "they" or "them".

**32.** Defendant's expert stated, "So I think a reasonable conclusion would be that Philadelphia is obviously segregated along with all 200 other cities studied." (N.T. 50–78). The evidence presented at trial shows that other major cities in the East and Northeast are also racially segregated. (N.T. 50–68, 50–71, Exhibit D–1, D–2). Philadelphia, according to one study, has become slightly less racially segregated in the last ten years, as did every other major Eastern and Northeastern city indexed by de-

fendant's expert, with the exception of Newark, New Jersey. (Exhibit D–1, D–2, D–3).

**33.** At the end of the 19th century, the Black population in Philadelphia had reached 40,000, placing Philadelphia second in Black population among the ten largest cities in the United States. (N.T. 31–43).

**34.** In 1940, the Black population in the City of Philadelphia was 252,757, and comprised 13.1% of the total population in Philadelphia. (N.T. 31–63).

tween 1930 and 1940 and in 1970 there were only 100 Black residents in the area. (N.T. 31–57, 31–70, Exhibits P–146, P–147, P–148, P–152, P–154). Since 1940, the Black population of the City of Philadelphia has been on the increase. (N.T. 31–64, 31–65). In the period 1950–1960, following World War II, there was a large migration of Black people from the South to the Northeastern United States. (N.T. 31–65). In 1970, 34.4% of the population in the City of Philadelphia was non-White. (N.T. 31–68, 50–90).[35]

As the Black population in Philadelphia has increased from 1940 until the present, the West Philadelphia Black population area has grown to include an area south of Market Street and the North Philadelphia Black population has expanded considerably to the north. (N.T. 31–67, 31–69).[36] However, large areas of Philadelphia have remained areas with very few Black residents and indeed, some areas since 1940 have shown a decrease in Black population. (N.T. 31–70, 31–72, 31–73, Exhibits P–188, P–189). In 1970, 68.9% of all Blacks in Philadelphia lived in areas which were 75% or more Black. (N.T. 31–75). In the ten years between 1960 and 1970, there was an increase in those areas which are racially impacted, i, e., have a minority concentration of 40% of more. (N.T. 51–59, Exhibits P–152, P–154).[37]

PHA was created in 1937 and adopted a policy which resulted in the segregation of its public housing projects according to the racial composition of the neighborhood in which they were located. (N.T. 31–76, 31–79).[38] As a result of this policy, the first housing projects acquired by PHA, Tasker Homes, Johnson Homes and Richard Allen Homes, became segregated: Johnson and Allen being over 90% Black, while Tasker was over 90% White. (N.T. 31–80, 31–88, 31–89, 31–90, Exhibit P–145). By 1950, PHA had acquired five additional housing projects, all located in White areas of Philadelphia and all occupied overwhelmingly by White tenants. (N.T. 31–92, 31–94, Exhibit P–146). Between 1950 and 1960, PHA took over 15 new public housing projects, which more than doubled the public housing stock in Philadelphia. (N.T. 31–95, 31–96). Of the fifteen new projects, eleven were built in the three Black areas of Philadelphia and were populated 96% by Black tenants. (N.T. 31–96).[39] The four other new projects were located in White areas of Philadelphia and were tenanted 88% by White tenants. (N.T. 31–96, 31–97). As of 1960, only one public housing project operated by PHA could be characterized as integrated. (N.T. 31–97). All the other projects were tenanted in accordance with the racial composition of the area in which they were located. Presently, PHA operates under a policy which it characterizes as "a freedom of choice policy," pursuant to which tenants are permitted to list their choice concerning

35. In 1960, the non-White population of Philadelphia comprised 26.7% of the total population. (N.T. 50–89). This increase in percentage of the City's total population between 1960 and 1970 represented an increase of 135,000 Blacks.

36. Defendant's expert testified that the Black population has shown some mobility in the recent past. However, he conceded that such mobility did not result in a racial mixture but simply a reconcentration of Black population in more racially impacted areas of the City, and the expansion was probably the result of the large growth of Black population. (N.T. 51–67, 51–74). Further, defendant's expert testified that there were only three census tracts in the City of Philadelphia which could be characterized as having a stable interracial population composition. (N.T. 51–79).

37. These areas increased, according to the defendant's expert, because the total Black population increased, while the total population of Philadelphia remained stable. (N.T. 51–59). This also led to an increase in the total number of census tracts containing Black population of over 10%. (N.T. 51–60).

38. *See Favors v. Randall,* 40 F.Supp. 743 (E.D. Pa.1941) in which the court upheld this policy of racial segregation.

39. There was one exception, Spring Garden Apartments, which was under 90% Black, but still populated overwhelmingly by Black tenants. (N.T. 31–96).

the location of the public housing projects which they prefer. (N.T. 56–70, 56–77).

In the ten year period 1960 to 1970, PHA constructed twelve new public housing projects, nine of which were built in overwhelmingly Black neighborhoods. (N.T. 31–98, 31–104). After 1970, PHA's housing construction activity slowed somewhat with seven additional projects being built adding only 270 units. Five of these projects were located in overwhelmingly Black neighborhoods, and two were located in racially mixed neighborhoods. (N.T. 31–104, 31–105). There are presently 50 public housing projects in Philadelphia operated by PHA on which occupancy reports have been obtained. (N.T. 31–105, 31–106).[40] As of June, 1974, forty of these projects were 75% or more Black occupied, and six were 90% or more White occupied. (N.T. 31–106). Two of the four remaining projects were housing for the elderly built in racially mixed neighborhoods. (N.T. 31–107).

PHA has also established a program of scattered site housing, in which a housing unit is bought or leased by PHA and offered to public housing tenants. (N.T. 31–119).[41] As of 1969, well over 90% of all scattered site units in Philadelphia were concentrated in two of the three Black areas of Philadelphia. (N.T. 31–117, Exhibits P–149, P–158.[42] This policy of locating scattered site units in predominantly Black residential areas of Philadelphia has continued to the present time. (N.T. 31–120, 31–121).

PHA public housing projects continue to reflect the racial composition of the neighborhood in which they are located. (N.T. 31–124, 31–125, 31–128). Those located in White neighborhoods are predominantly White, while those located in Black neighborhoods are predominantly Black. Most of the public housing projects and the scattered site units are located in Black residential areas of the City of Philadelphia. (N.T. 31–128). As of 1974, 90.8% of all the units in the public housing stock of Philadelphia were occupied by non-White tenants. (N.T. 31–126, Exhibit P–194). The percentage of non-White public housing occupancy has increased steadily from 1963 until the present. (Exhibit P–194).[43] Further, one-half of the White families living in public housing in 1974, lived in projects which were 95% or more White. (N.T. 31–129).

As of 1970, of the 54,000 families in Philadelphia with incomes below the poverty level,[44] over 31,000, or 58% were Black. (N.T. 31–130). In addition, 77% of Black households in Philadelphia had incomes below the median income for the standard metropolitan area, while only 52% of the White families were below the median. (N.T. 31–130). Further, the areas of the City of Philadelphia which have the highest concentration of lowest income families are precisely those areas which have the highest concentration of Black population, i. e., the three previously identified Black areas of Philadelphia. (N.T. 31–131). This points to the obvious conclusion that there is a coexistence between race and low income in Philadelphia.[45] Also, these areas of high concen-

---

**40.** This number does not reflect additions to existing projects, which HUD considers as separate projects. (N.T. 31–106).

**41.** The scattered site housing program includes both houses which PHA purchases and renovates and leases to public housing tenants, and houses which PHA leases from a private owner and then offers as public housing. (N.T. 31–119).

**42.** Prior to 1969, City Council had restricted its authorization for the acquisition of scattered site housing by PHA to West Philadelphia, north of Market Street, an area of concentrated Black population. (N.T. 31–118).

**43.** In 1972, 84% of the public housing units in Philadelphia were occupied by non-White tenants. (Exhibit P–194).

**44.** The poverty level is defined as those families whose income averages less than $500.00 per person per year. (N.T. 31–130).

**45.** Defendant's expert testified that the Black population had shown overall economic improvement in the ten years between 1960 and 1970. (N.T. 51–70 to 51–74). However, he did not take issue with the conclusion that Blacks live in the poorest sections of Philadelphia and represent a higher percentage of the lowest income levels in Philadelphia. Indeed, defendant's expert testified that the median low in-

tration of Black population have the lowest percentage of owner occupied housing in Philadelphia. (N.T. 31–133, Exhibits P–156, P–157). The three areas which have been identified as the predominantly Black areas of Philadelphia contain owner occupied housing with the lowest values in Philadelphia. (N.T. 31–133, 31–134, Exhibits P–158, P–159). As of 1970, the highest incidence of overcrowded housing units in Philadelphia occurred in the three Black residential areas of Philadelphia. (N.T. 31–135, Exhibit P–163). These statistics clearly reveal that the Black population in the City of Philadelphia is concentrated in residential areas of the City which are characterized by the lowest housing quality, and the highest incidence of overcrowding. Finally, combined with the fact that the Black population has a disproportionate number of people with incomes below the poverty level these statistics lead to the conclusion that the Black population in Philadelphia occupies the poorest housing because it cannot afford to live elsewhere.

As noted earlier, the area comprising the Whitman project observed a decline of about 300 in its Black population between 1930 and 1940 and in 1970 there were only 100 Black residents in the area. (N.T. 31–57, 31–70, Exhibits P–146, P–147, P–148, P–152, P–154). Clearance for the Whitman Townhouse project took place in 1959 and 1960 and clearance for the Whitman Urban Renewal Project took place in the late 1960's, prior to 1969. (N.T. 31–144). In 1950, the area which became the site for the Whitman Park Townhouse Project, i. e., bounded by Porter Street to the north, Oregon Avenue to the south, Front Street to the east, and midway between Second Street and Hancock on the west, contained a large number of Black families. Indeed, in 1950, 46% of the families living on the Whitman site were Black, which made this

area an integrated section of Philadelphia. (N.T. 31–146). As of 1960, when the Whitman site was being cleared, four Black families remained on the Whitman site, while the area adjacent to Second Street had a substantial increase in the number of Black families. (N.T. 31–147, Exhibits P–169, P–195).[46] However, by 1970, after completion of the clearance for the Whitman Park Townhouse Project and the Urban Renewal, there were no Black families living in the southeastern portion of the Whitman area. (N.T. 31–148, Exhibit P–170).[47] The area adjacent to the west of the Whitman Park Townhouse Project site, i. e., Third and Phillips Streets, which contained many Black families, was cleared by RDA in the course of its activities in connection with the Whitman Urban Renewal Area. New townhouses have been built in this area consisting of over 100 units, which are now occupied exclusively by White residents. (N.T. 31–153, 31–154, Exhibit P–195). The effect of these urban clearance actions by both RDA and PHA appears to have converted an integrated area of Philadelphia into a non-integrated area.

In the years between 1967 and 1972, several public housing projects, in addition to the Whitman Park Townhouse Project, were proposed for construction in predominantly White areas, but were never completed because of public opposition. For example, in the fall of 1968, a 192 unit public housing project was proposed for the Roxborough area of Philadelphia, a White area of the City. However, opposition surfaced to the proposed project and the developer abandoned the project. (N.T. 6–43, 6–47, 6–48, Exhibit P–33). In addition, a public housing project proposed for Welsh Road in the near Northeast section of Philadelphia, a White area of the City, which required a zoning change, was dropped

come level of Blacks in Philadelphia has prevented their movement, in terms of housing, to predominantly White areas of the City. (N.T. 51–75, 51–76).

**46.** The number of Black households in blocks adjacent to the Whitman site doubled from 15 to 30. (Exhibit P–195).

**47.** The only area in which there are any Black households in the Whitman area is the far northeast corner of the Whitman area. (N.T. 31–148, Exhibit P–170).

when public opposition arose. (N.T. 6–48, 6–50, Exhibit P–33). In the far Northeast section of Philadelphia, a predominantly White area of the City, 92 units of Turnkey III public housing were proposed for Woodhaven and Barbary. A zoning change was required and public opposition arose which resulted in the developer changing his plans and proposing 110 units of higher density, unsubsidized housing, which the community supported. (N.T. 6–53, 6–55, 6–58, 6–59).

STANDING

■ The defendants contend that the record in this case does not support a finding that any plaintiffs, either individual or organizational, have standing to represent the class certified by this Court. In an Order dated May 7, 1975 this Court certified this case as a class action on behalf of "all low income minority persons residing in the City of Philadelphia who, by virtue of their race are unable to secure decent, safe, and sanitary housing, outside of areas of minority concentration, and who would be eligible to reside in the Whitman Park Townhouse Project." It is, of course, elementary that in order to maintain a class action there must be at least one named plaintiff, whether individual or organizational, who has established the requisite standing to maintain the action. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975).[48] The question of standing is in

essence the question of whether the plaintiffs are entitled to have the court decide the merits of the dispute and "involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2205, 498 (1975).[49] "[T]he standing question in its Art. III constitutional aspect 'is whether the plaintiff has "alleged such personal stake in the outcome of the controversy" to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.' " *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 38, 96 S.Ct. at 1924, quoting from *Warth v. Seldin,* 422 U.S. 490, 498–499, 95 S.Ct. 2197 (1975). The party seeking review must himself have suffered an injury that is likely to be redressed by a favorable decision. *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ An association or organizational plaintiff may establish standing in either of two ways. First, an organization may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the organization itself may enjoy. In seeking relief from injury to itself, the organization may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. *NAACP v. Alabama,* 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Second, even in the absence of injury to itself, an organization may have standing solely as a representative of its members, so long as the organization alleges "that its members, or any one of them, are suffering immediate or threatened injury as a result

**48.** *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917 (1975).

**49.** In the Supreme Court's recent opinion in *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) the Court framed the issue as follows:

[T]wo distinct standing questions are presented. We have distinguished them in prior cases, . . . and they are these:

first, whether the plaintiff-appellees allege "injury in fact," that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and, second, whether, as a prudential matter, the plaintiff-appellees are proper proponents of the particular legal rights on which they base this suit. 428 U.S. at 112, 96 S.Ct. at 2873.

of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211 (1975).

Apart from these minimal constitutional mandates, there are other prudential limitations on the standing requirement of plaintiffs in the U.S. District Court. These limitations were recently enumerated by the U.S. Supreme Court as follows:

First, the Court has held that when the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. . . . Second, even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205.[50] (Citations omitted).

With these principles in mind, we will look to the facts of this case and analyze the standing of the plaintiffs involved. The primary focus of our inquiry in this suit turns upon whether an individual plaintiff has established an actual injury, or whether the plaintiff organizations have established actual injury to any of the persons which they represent.

 Jean Thomas, a Black woman, testified that she was currently living in public housing which was unfit for her family, that her current "scattered site" house is located in a racially impacted area of the City, that she has applied to PHA for a transfer, that there is no space available for her and that she would like to move to the Whitman project if it is built. We find that Ms. Thomas has sufficiently established that she will be immediately and personally injured if the Whitman project is not built.[51] Further, Ms. Thomas does not allege a generalized grievance which is shared by a large class of citizens, nor does she seek to represent a third party not a plaintiff in this action. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197 (1975).

After the trial of this case, the defendants alleged that Ms. Thomas wished to change her testimony. However, after a hearing Ms. Thomas refused to testify on the basis of her Fifth Amendment privilege against self incrimination. Therefore, her testimony remains unchanged, attacked only by allegations by other counsel in the case that her trial testimony was false. However, even with Ms. Thomas' testimony stricken from the record in this case, Nellie Reynolds, chairperson of RAB, testified, and, although she testified in her representative capacity as the head of RAB, in the cross-examination of Ms. Reynolds it was established that she had the requisite standing to be a plaintiff. Ms. Reynolds, a Black woman, lives in a high rise public housing project located in a Black area of the City. She testified that she was dissatisfied with her current housing, that she would like to live in an integrated area of Philadelphia and that the Whitman Park Townhouse

50. In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the U.S. Supreme Court enumerated two exceptions to the rule that a litigant may not assert the rights of third parties not involved in the lawsuit. The Supreme Court stated that if the relationship of the litigant to the person whose right he seeks to assert is "inextricably bound up with the activity the litigant wishes to pursue, the Court . . . can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." Second, the Court may inquire into the ability of the third party to assert his own right. "If there is some genuine obstacle to such assertion," the third party who is in court becomes "the right's best available proponent." 428 U.S. at 114, 116, 96 S.Ct. at 2874. Because under the facts of this case we have no third party involvement, these exceptions are not applicable to this case.

51. Ms. Thomas did not testify that she was scheduled to move to the Whitman project. However, the tenants had not yet been selected for the Whitman area, other than that the tenants were to be from public housing eligibility lists. Her failure to testify that she would have moved to Whitman does not destroy her standing.

Project would have provided her with such an opportunity. Ms. Reynolds testified that, at present, no such openings exist. She asserted more than a generalized grievance shared by a large class and she does not seek to represent the interests of a third party.

■ In addition, we find that RAB is a proper party plaintiff with standing to represent its members. Although there is no allegation that RAB was injured as an organization by the termination of the Whitman project, it is clear that RAB has established actual injury to its members. As pointed out earlier, RAB is an organization composed of persons who are living in public housing or who are eligible for public housing. RAB's membership is 95% Black and RAB represents all those who are tenants in public housing or are eligible to become tenants. RAB contends that low income minority residents of the City of Philadelphia are unable, because of their race, to secure decent housing outside areas of minority racial concentration and that the failure to build Whitman has deprived them of the opportunity to escape from these conditions. Clearly, if RAB's claims are legally cognizable, its members have been injured by the failure to build the Whitman project. Those RAB members who live in racially impacted areas of the City of Philadelphia are obviously harmed by the failure to build a scheduled housing project in a non-racially impacted area. Those on the waiting list, which is predominantly Black, have lost the opportunity to live in public housing in a White area. Further, the complaint in this case seeks only declaratory and injunctive relief which is prospective in nature and any remedy granted can reasonably be expected to inure to the benefit of those members of the association who have been actually injured. *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197 (1975). We find, that the members of

RAB will suffer actual injury if the Whitman project is not built.

The issue as to the standing of the Housing Task Force presents a more difficult question. However, since we have determined that there are other plaintiffs in this case who possess the standing required to maintain the action, we need not decide the standing of the Housing Task Force. We do note, however, that the evidence shows that at least one member of the Housing Task Force currently resides in public housing.

*Class Action Determination*

■ As stated herein this Court has certified this action as a class action on behalf of "all low income minority persons residing in the City of Philadelphia who, by virtue of their race are unable to secure decent, safe, and sanitary housing, outside of areas of minority concentration, and who would be eligible to reside in the Whitman Park Project." In their briefs attacking the plaintiffs' standing in this case, the defendants, although not specifically addressing the class action issue, have argued that the claims of the plaintiffs are not typical of the claims of the class, and that therefore the representative parties will not fairly and adequately protect the interests of the class as required by Rule 23(a)(3) and (4) Federal Rules of Civil Procedure.[52] We find that the plaintiffs in this case do present claims that are typical of those of the class and will fairly and adequately protect the interests of the class. The plaintiffs are presently in public housing or represent those who are in public housing or who are on the waiting list for public housing. Defendants contend that the plaintiffs have never applied to live in the Whitman project and therefore were not harmed by the failure to build Whitman. We find no merit to this contention in view

**52.** Rule 23(a) of the Federal Rules of Civil Procedure provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

of the fact that there was no procedure for anyone to apply for admission since the Whitman project was never constructed. We find that this action is appropriate for class treatment under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

*The Merits*

Plaintiffs have advanced three separate legal theories which they claim establish liability against all the defendants under the facts of this case. First, plaintiffs argue that the governmental defendants have an obligation under Title VIII of the Civil Rights Act of 1968 (The Fair Housing Act) 42 U.S.C. § 3601 *et seq.,* to act affirmatively to promote integration in all federally assisted housing programs. Plaintiffs argue that the action taken by the governmental defendants in this case perpetuates the existing racially segregated low income public housing system in the City of Philadelphia and hence violates the affirmative duty imposed by Congress under the 1968 Fair Housing Act. On the basis of this record we find that the governmental defendants have failed to exercise their affirmative duties imposed by the 1968 Civil Rights Act in connection with the Whitman Park Townhouse Project.

Second, the plaintiffs contend that Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.,* and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, preclude governmental and private action which has an adverse racial effect or a racially discriminatory effect. Under this second theory, plaintiffs contend that they need only establish that the governmental and private actions taken to cancel the Whitman Park Townhouse Project had an adverse effect on racial minorities, or a racially discriminatory effect. The burden would then shift to the defendants to show a compelling governmental interest justifying the adverse racial effect. We find that the actions taken by the governmental defendants in this case have had a racially discriminatory effect and that those defendants have established no compelling governmental interest justifying their action.

As to their third theory of liability, plaintiffs contend that the evidence presented in this record shows that the governmental and private defendants acted with a racially discriminatory purpose or intent in terminating the Whitman Park Townhouse Project. Such action taken with a racially discriminatory purpose would violate the Fifth, Thirteenth, and Fourteenth Amendments, as well as the various Civil Rights Statutes, 42 U.S.C. §§ 1981, 1982, 1983, 2000d, and 3601 *et seq.* Plaintiffs contend that once a racially discriminatory purpose or intent is found, there is no defense and liability follows. We also find that the evidence in this record establishes that the City of Philadelphia acted with a racially discriminatory purpose in halting the Whitman Park Townhouse Project, and in cancelling the contracts with Multicon therefor.

a) *Affirmative Duty*

As to the plaintiff's first theory of liability, i. e., that the governmental defendants were obligated to act affirmatively to promote integration in all federally funded housing, we note that Congress has long been concerned with the complex and severe problems created by segregated housing in the United States and has accordingly enacted various statutes intended to remove racial discrimination in housing. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d bans racial discrimination in all federally assisted programs in the following language:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Congress extended the prohibition on race discrimination to private housing and added provisions applicable to governmental housing which were designed to give further force to the provisions of the 1964 Act when it enacted the fair housing provisions con-

tained in Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* The 1968 Act states that:

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. 42 U.S.C. § 3601.

The operative section of Title VIII, 42 U.S.C. § 3604, bars discrimination in the sale or rental of housing, including both governmentally and privately operated units, as to both the actual sale or rental and all terms and conditions, in the following language:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

Along with outlawing private housing discrimination for the first time, the sponsors of the Fair Housing Act determined that the provisions of Title VI of the Civil Rights Act of 1964 prohibiting discrimination in federally assisted housing required strengthening. Senator Brooke, in stating that the 1964 Act had not achieved its desired effect, stated:

> Rarely does HUD withhold funds or defer action in the name of desegregation. In fact, if it were not for all the printed guidelines the housing agencies have issued since 1964, one would scarcely know a Civil Rights Act had been passed. 114 Cong. Record 2527–2528.

Senator Brooke pointed out that "an overwhelming proportion of public housing . . . in the United States directly built, financed and supervised by the Federal Government—is racially segregated."

114 Cong. Record 2528. Senator Brooke also stated:

> What adds to the murk is officialdom's apparent belief in its own sincerity. Today's Federal housing official commonly inveighs against the evils of ghetto life even as he pushes buttons that ratify their triumph—even as he ok's public housing sites in the heart of Negro slums, releases planning and urban renewal funds to cities dead-set against integration, and approves the financing of suburban subdivisions from which Negroes will be barred. These and similar acts are committed daily by officials who say they are unalterably opposed to segregation, and have the memos to prove it.
>
> . . . But when you ask one of these gentlemen why, despite the 1962 fair housing Order most public housing is still segregated, he invariably blames it on regional custom, local traditions, personal prejudices of municipal housing officials. 114 Cong. Record 2281.

Senator Brooke concluded by saying:

> In other words, our Government, unfortunately, has been sanctioning discrimination in housing throughout this Nation. *Id.*

Senator Mondale also addressed the actions of government in promoting or continuing racial segregation in housing:

> Negroes who live in slum ghettos, however, have been unable to move to suburban communities and other exclusively White areas.
>
> In part, this inability stems from a refusal by suburbs and other communities to accept low-income housing . . . .. An important factor contributing to exclusion of Negroes from such areas, moreover, has been the policies and practices of agencies of government at all levels. 114 Cong. Record 2277. (Quoting the *Milwaukee Journal*).

The preceding passages make it clear that Congress was well aware of governmental action contrary to previous legislative prohibitions of racial discrimination in housing. Congress was aware of the refusal of cer-

tain communities to accept low income housing, which refusal added to the inability of low income Blacks to escape their "slum ghettos." Therefore, in an effort to end segregation in public housing Congress enacted § 3608(d)(5), requiring affirmative action by HUD and HUD assisted agencies to cure this widespread problem. That section provides that:

> (d) The Secretary of Housing and Urban Development shall—

> (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter. 42 U.S.C. § 3608(d)(5).

It is this provision, commanding affirmative action to end segregation in housing and to promote fair housing, which we find the governmental defendants in this case have violated.

We are, of course, guided in our determination of the standards required by governmental agencies under § 3608(d)(5) by our Third Circuit's decision in *Shannon v. HUD*, 436 F.2d 809 (1970). The Third Circuit in *Shannon* described the progression in the Civil Rights Acts from the commands of the 1964 Act of non-discrimination to the affirmative requirements in the 1968 Act that governmental agencies promote fair housing as follows:

> Read together, the Housing Act of 1949 and the Civil Rights Acts of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend or to prevent the recurrence of such blight. In 1949 the Secretary, in examining whether a plan presented by a LPA included a workable program for community improvement, could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. By 1964 he was directed, when considering whether a program of community development was workable, to look at the effects of local planning action and to prevent discrimination in housing resulting from such action. In 1968 he was directed to act affirmatively to achieve fair housing. Whatever were the most significant features of a workable program for community improvement in 1949, by 1964 such a program had to be nondiscriminatory in its effects, and by 1968 the Secretary had to affirmatively promote fair housing. 436 F.2d at 816.

In *Shannon*, HUD had failed to consider the racial composition of the area in which low-moderate income housing was to be constructed before its issuance of a contract of insurance and approval of a project for a rent supplement contract. Rather HUD had only examined the land use factors involved in approving the project. The Court stated that the discretion of HUD to choose the methods of achieving the national housing objectives "must be exercised within the framework of the national policy against discrimination in federally assisted housing, 42 U.S.C. § 2000d, and in favor of fair housing. 42 U.S.C. § 3601. When [a] . . . decision is made without consideration of relevant factors it must be set aside." 436 F.2d at 819.[53] The Court in *Shannon* held that HUD could not be "color blind" in connection with the "very .real effect that racial concentration has had on urban blight," 436 F.2d at 820, and noted that "Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy." 436 F.2d at 821.

■ Other courts have agreed with our Third Circuit and have held that the affirmative duty required by Title VIII of the 1968 Civil Rights Act applies not only to HUD but applies as well to other governmental agencies administering federally financed housing programs. *Garrett v. City of Hamtramck*, 503 F.2d 1236 (6th Cir. 1974); *Blackshear Res. Org. v. Housing Auth. of City of Austin*, 347 F.Supp. 1138

---

**53.** The Court in *Shannon* held that the decision of HUD was reviewable under 42 U.S.C. § 3608(d)(5) to determine whether the affirmative duties required under the Act had been met. 436 F.2d at 820.

(W.D.Tex.1972). In *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973), a case involving the assignment of tenants to a low-income housing project,[54] the Court stated that the New York City Housing Authority was "under an obligation to act affirmatively to achieve integration in housing," and that a "source of the affirmative duty to integrate is found in the 1968 Fair Housing Act . . . ." 484 F.2d at 1133. The Court in *Otero* pointed out that under Title VIII:

> An authority may not, for instance, select sites for projects which will be occupied by non-whites only in areas already heavily concentrated with a high proportion of non-whites. . . .

> An authority is barred from using assignment methods which seek to exclude, or have the evident effect of excluding, persons of minority races from residing in predominantly white areas or of restricting non-whites to areas already concentrated by non-white residents. 484 F.2d at 1133. (Citations omitted).

The Second Circuit, in *Otero,* citing *Shannon,* then stated:

> [W]e are satisfied that the affirmative duty placed on the Secretary of HUD by § 3608(d)(5) and through him on other agencies administering federally-assisted housing programs also requires that consideration be given to the impact of proposed public housing programs on the racial concentration in the area in which the proposed housing is to be built. Action must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat. . . .

The affirmative duty to consider the impact of publicly assisted housing programs on racial concentration and to act affirmatively to promote the policy of fair, integrated housing is not to be put aside whenever racial minorities are willing to accept segregated housing. The purpose of racial integration is to benefit the community as a whole, not just certain of its members. 484 F.2d at 1133–1134.

In *Banks v. Perk,* 341 F.Supp. 1175 (N.D. Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir. 1973), the plaintiffs brought suit against the City of Cleveland and the Cleveland Housing Authority. Cleveland was found by the Court to be a racially segregated city. Prior to the date on which the new City administration took office, it announced that it would oppose public housing in areas where the majority of the residents were opposed to the project. Two days after taking office, the administration revoked a building permit issued to a builder who was planning to build a low income public housing project in a White area of the City. Twelve days later, a similar permit was suspended. The Court found in both instances that the reasons given by the City for revocation of the permit were without factual basis. The Court found that the City's revocations had a racially discriminatory effect and violated 42 U.S.C. § 2000d and 42 U.S.C. § 3608(d)(5). As to the City administration's policy in connection with

---

**54.** In *Otero,* a low-income housing project was constructed on a site which, according to the regulations of the New York City Housing Authority, required giving former site residents a priority on admission. If the priority were followed, the project would be 80% non-White and 20% White in an area which currently had a 50–50 racial mix. The authority was concerned that such a large concentration of non-Whites would act as a "tipping" factor which would precipitate an increase in non-White population in the surrounding neighborhoods. The Second Circuit concluded that the affirmative action obligation of § 3608(d)(5) precluded adherence to the priority regulation due to the segregating effect:

> Such a rule of thumb gives too little weight to Congress' desire to prevent segregated housing patterns and the ills which attend them. To allow housing officials to make decisions having the long range effect of increasing or maintaining racially segregated housing patterns merely because minority groups will gain an immediate benefit would render such persons unwilling, and perhaps unwitting, partners in the trend toward ghettoization of our urban centers. 484 F.2d at 1134.

its support for local communities, the Court stated:

> The aforementioned public pronouncements to oppose public housing in any areas where the residents are opposed to it and the City's continued affirmations of that proposition are contrary to the national housing policy. It is the duty of city administrations in the United States to support and aid progressive proposals which have as their goal the elimination of racial concentrations in their cities. No matter how a housing authority may try, their aims and goals cannot be met without the support and leadership of the administration within the city it attempts to build public housing. Since this nation is committed to a policy of balanced and dispersed public housing, low-income Blacks can no more be confined to a concentrated area than that they can be required to send their children to segregated schools. 341 F.Supp. at 1179.

The Court in *Banks* also applied the affirmative obligation requirement of 42 U.S.C. § 3608(d)(5) to the Cleveland Housing Authority and found that it had not met its obligation thereunder when it failed to place most of its new housing projects in White areas of the City. The freedom of choice plan of the Authority, which was neutral on its face but resulted in continued racial concentration, could not stand in light of the affirmative obligations of the Fair Housing Act. The Court stated that:

> CMHA has an affirmative duty to integrate its housing projects and to be instrumental in dispersing urban housing patterns. The Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. in establishing a national policy of fair housing throughout the United States carried with it the clear implication that local housing authorities in conjunction with Federal agencies responsible for housing programs are to affirmatively institute ac-

tion the direct result of which was to be the implementation of the dual and mutual goals of fair housing and the elimination of discrimination in that housing. 341 F.Supp. at 1182.[55]

Other courts have also found violations of the affirmative duties placed upon HUD and local agencies under 42 U.S.C. § 3608(d)(5) in circumstances similar to those in this case. *Garrett v. City of Hamtramck,* 503 F.2d 1236 (6th Cir. 1974); *Blackshear Res. Org. v. Housing Auth. of City of Austin,* 347 F.Supp. 1138 (W.D.Tex. 1972); *Crow v. Brown,* 332 F.Supp. 382 (N.D.Ga.1971), *aff'd,* 457 F.2d 788 (5th Cir. 1972).

 Each case brought under § 3608(d)(5) requires a close analysis of the facts peculiar to that case and the city in which the facts have occurred. Before proceeding to analyze the liability of each individual governmental defendant, it is appropriate to note several significant factors which form the background against which the actions of the governmental defendants involved herein must be viewed. First, it is beyond question that the City of Philadelphia is racially segregated, and was so in 1971 and 1972. It is also clear that the low-income public housing system operated by PHA is also racially segregated with those projects located in Black areas being populated by predominantly Black tenants, while those in White areas are populated by predominantly White tenants. Further, 31 of the 40 PHA projects, or 77% of the PHA projects, are currently located in racially impacted areas of Philadelphia while only 9 of the 40, or 23% of the PHA projects are currently located in non-impacted areas. (N.T. 53–21). Moreover, the evidence presented clearly establishes that the overwhelming majority of the scattered site houses acquired by PHA are located in racially impacted areas of Philadelphia, a process which reinforces segregation both

---

**55.** Many of the cases cited herein found violations of both the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. § 1981 and § 1983, as well as 42 U.S.C. § 2000d and 42 U.S.C. § 3608(d)(5). These cases were decided prior to *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which held that racially discriminatory intent or purpose was required to establish a constitutional violation. However, each of these decisions did find a violation of the affirmative duty of governmental agencies under 42 U.S.C. § 3608(d)(5).

in the City of Philadelphia and in the low-income public housing system. (N.T. 38–55).[56] The public housing system operated by PHA is predominantly Black. As of 1974, 90.8% of the persons residing in conventional housing projects (those units which were not scattered site) were non-White.[57] While one would expect that most PHA conventional projects would have a non-White population reflecting the Black population of the entire PHA low-income public housing system, four projects located in predominantly White areas of Philadelphia have a predominantly White tenant population. (N.T. 53–39, Exhibit D–26). 96.8% of the scattered site units in Philadelphia are populated by racial minorities, with, as pointed out above, 82% of these being located in racially impacted areas of the City. Furthermore, the clearance by PHA and RDA which took place on and around the Whitman site, coupled with the cancellation of the Whitman Park Townhouse Project, has reinforced segregation in Philadelphia. Because of the clearance, which led to the displacement of Blacks from a fairly integrated pocket in the Whitman area, Whitman has become more segregated than prior to governmental intervention.

The cancellation of the Whitman Park Townhouse Project had a racially disproportionate effect, adverse to Blacks and other minorities in Philadelphia. The waiting list for low-income public housing in Philadelphia is composed primarily of racial minorities. Of the 14,000 to 15,000 people on the waiting list for public housing in Philadelphia (N.T. 56–84), 85% are Black, and 95% are considered to be of racial minority background. (N.T. 40–103). Obviously those in housing projects, which are overwhelmingly Black, and those on the public housing waiting list, are those least able to move out of the poorer, racially impacted areas of Philadelphia. The evidence also established that

Blacks in Philadelphia who are concentrated in the three major Black areas of Philadelphia, have the lowest median income in comparison with the total population of Philadelphia and live in the poorest housing in Philadelphia. The Whitman Park Townhouse Project was a unique opportunity for these Blacks living in racially impacted areas of Philadelphia to live in an integrated, non-racially impacted neighborhood in furtherance of the national policy enunciated in Title VIII of the Civil Rights Act of 1968. Public housing offers the only opportunity for these people, the lowest income Black households, to live outside of Black residential areas of Philadelphia. Cancellation of the project erased that opportunity and contributed to the maintenance of segregated housing in Philadelphia.

### 1) *City of Philadelphia*

■ We find that, in view of the pattern of racial segregation which prevailed in both private and public housing in Philadelphia, the City of Philadelphia has not, under the facts of this case, met its duty of affirmatively implementing the national policy of fair housing and has violated Title VIII of the Civil Rights Act of 1968. Initially, we find that the policy of the current administration to support local communities in their opposition to projects in their neighborhoods without consideration of the effect of such support or the basis of the opposition to the proposed project is contrary to the overriding national policy to further integration in housing. *Banks v. Perk,* 341 F.Supp. 1175, 1179 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir. 1973). We do not intimate that local governmental officials should not be sensitive to the desires of their constituents on whose support they depend for election. However, in respecting the desires of the local communi-

---

**56.** Defendants' expert testified that 82% of the scattered site units operated by PHA are located in racially impacted areas of Philadelphia, i. e., areas with a minority concentration of over 40%. (N.T. 51–136). Of the 8,235 total scattered site units operated by PHA, 6,747 are located in racially impacted areas. (Exhibit D–32).

**57.** Of the total 47,313 persons residing in conventional public housing projects as of 1974, 42,950 were non-White. (Exhibit D–28).

ties, governmental officials are not free to ignore the law and override a national policy of fair housing as enunciated in Title VIII of the Civil Rights Act of 1968. Further, the specific pledge of support by Mayor Rizzo to WAIC in their fight to stop the Whitman Park Townhouse Project encouraged that community not only to continue their opposition, but to amplify it.

Mayor Rizzo asserted in his testimony that his policy is racially neutral and that his actions are taken without a view toward any particular race. He candidly stated in connection with the potential effects of his action on racial minorities that:

I would have to say that never entered my mind. But thinking it over, I would say there is a possibility that that might affect the minorities, that they might be shortchanged, but it would not change my position. (N.T. 42–83, 42–84).

Such "color-blindness" does not comply with the mandates of affirmative action required by Title VIII. *Shannon v. HUD,* 436 F.2d 809 (3d Cir. 1970). Also, Deputy Mayor Phillip Carroll, who was assigned by Mayor Rizzo to handle the Whitman controversy, testified that he was not aware of the racial composition of public housing in Philadelphia. (N.T. 25–49). Such unawareness or insensitivity to racial problems on the part of a public official does not comply with the affirmative duties imposed by Title VIII.

The City has consistently argued throughout this case that it does not build public housing and is under no duty to do so. However, the facts show that the cooperation of the City Administration is required to construct a housing program. Further, as the facts here graphically illustrate, the City was capable of preventing the construction of a public housing project which had been approved and was under construction.

 The City had a duty to encourage and cooperate in the building of public housing which would foster fair housing. *Banks v. Perk, supra,* at 1185. However, the facts of this case establish that rather than cooperate in building the project, two City Administrations interfered with and accomplished the termination of its construction. This non-cooperation began with the Tate Administration's stated intention to refuse to supply Multicon with police assistance at the Whitman site and was manifested by the dispute over the building of fences and sidewalks. Opposition was further manifested by the City's attempts to halt construction, its encouragement of local opposition to the Whitman Park Townhouse Project, its efforts to obtain an injunction, its encouragement of a June 22, 1972 RDA resolution declaring the Multicon contract void *ab initio,* its action to keep HUD out of the Whitman controversy, and by eventually paying damages to Multicon rather than insisting that Multicon fulfill its contract. In view of the heretofore described racial segregation in housing in Philadelphia, we find that these activities do not comply with the affirmative action requirements of Title VIII, 42 U.S.C. § 3608(d)(5) and are in violation of that section.

 The City argues that the threatened violence on the part of the citizens surrounding the Whitman project, should construction of the project have been permitted to resume, justified action on their part to halt construction of the Whitman Park Townhouse Project. However, it is well established that a history of tension or violence does not excuse the denial of civil rights. *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Gautreaux v. Chicago Housing Authority,* 296 F.Supp. 907 (N.D. Ill.1969), *aff'd,* 436 F.2d 306 (7th Cir. 1970), *cert. denied,* 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971).

2) *Redevelopment Authority of the City of Philadelphia*

RDA has, throughout the trial of this case, taken a position similar to that of the City of Philadelphia, i. e., that RDA does not build low-income public housing, and that therefore, they should not be held responsible for any actions taken in this "public housing" case. We find, however, that

RDA was intimately involved in the construction of the Whitman Park Townhouse Project and in the entire Whitman Urban Redevelopment Area. RDA became enmeshed in the Whitman project as a result of the Barrett Amendment which allowed a write-down of the value of the land previously owned by PHA and permitted lower density housing to be built on the site. Thereafter, RDA entered into a construction contract with Multicon for construction of the Whitman Townhouse Project.

 Since RDA was involved in the construction of a federally funded housing project, RDA had the same affirmative duty to achieve integration under 42 U.S.C. § 3608(d)(5) as did the City of Philadelphia. However, RDA did nothing to encourage the building of the Whitman Park Townhouse Project. Rather, RDA succumbed to the pressure to hinder construction and void the contracts between it and Multicon. On April 28, 1972, it passed a resolution authorizing its general counsel to take action in connection with any default by Multicon. Thereafter, on June 22, 1972, it took two unusual actions in connection with the Whitman Park Townhouse Project. First, in the lawsuit brought by WAIC, it withdrew its requested finding of fact which stated that it had met all the procedural legal requirements for building the Whitman Park Townhouse Project, a position it had steadfastly maintained throughout the trial. Second, it passed an unusual resolution declaring that its contract with Multicon was void *ab initio* for lack of citizen participation. These actions were taken without any effort to have Multicon honor its construction contract and have the project constructed. Furthermore, RDA must be charged with the knowledge that its clearance procedures in connection with the Whitman Urban Renewal Area, combined with PHA's clearance for the Whitman site, led to more segregation in the area surrounding the Whitman Park Townhouse Project. This course of conduct, viewed in its context of a racially segregated city, does not comply with the affirmative duties required of RDA and is in violation of 42 U.S.C. § 3608(d)(5).

3) *Philadelphia Housing Authority*

 It is clear that PHA has an affirmative duty to integrate its housing projects and be instrumental in dispersing urban housing patterns. *Banks v. Perk*, 341 F.Supp. 1175 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds*, 473 F.2d 910 (6th Cir. 1973). As stated in *Banks, supra;*

> The Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, in establishing a national policy of fair housing throughout the United States carried with it the clear implication that local housing authorities in conjunction with Federal agencies responsible for housing programs are to affirmatively institute action the direct result of which was to be the implementation of the dual and mutual goals of fair housing and the elimination of discrimination of that housing. 341 F.Supp. at 1182.

As noted herein, PHA maintains a racially segregated low-income public housing system. Although operating under a freedom of choice plan now, little if any progress has been made toward the integration of its housing system. Where a freedom of choice plan fails to achieve integration, but preserves the effects of past racial segregation, a more realistic plan must be developed. *Green v. County School Board of Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Banks v. Perk, supra.*[58]

 In connection with the Whitman Park Townhouse Project, the evidence es-

---

**58.** In *Banks*, the Court stated that:

Within the framework of their freedom of choice plan, CMHA must act as affirmatively as they can to act as real estate brokers to convince east side residents to move into scattered-site homes on the west side. CMHA and the Administration of the City of Cleveland are charged with the leadership of this proposal to integrate housing patterns in Cleveland. Since CMHA is charged with the building of public housing, it is their duty to devise appropriate policies and plans in this area. It is the obligation of the City to support CMHA, to encourage them in every way, and to aid in the integration of the housing patterns of the City with all its strength. 341 F.Supp. at 1185.

tablishes that PHA planned the project and cleared the area, creating a more racially segregated Whitman area. On April 28, 1972, in response to RDA's resolution of that day, PHA wrote RDA and stated that as of April 29, 1972, Multicon would be in default. This impending default was never communicated to Multicon. PHA has maintained throughout this litigation that it is ready to proceed with the Whitman Park Townhouse Project, which would be an affirmative step toward desegregation of its housing system. It has not done so. It has not proposed a plan, nor has it taken any action aimed at desegregating its racially segregated public housing system.[59] We find that PHA has not met its affirmative obligation under 42 U.S.C. § 3608(d)(5).

### 4) *Department of Housing and Urban Development*

■ We likewise find that HUD is liable under Title VIII of the Fair Housing Act, 42 U.S.C. § 3608(d)(5). The evidence is clear that HUD was aware that the other defendants were not in compliance with the Fair Housing Act of 1968 in their opposition to the Whitman Park Townhouse Project (N.T. 44–48, 45–20, 45–21, Exhibit P–113) and that there was racial motivation involved in the opposition to the project. (N.T. 44–48 to 44–52, Exhibit P–90). HUD was asked by Multicon on several occasions to intervene on behalf of Multicon to aid it in constructing the project, but provided no assistance. (N.T. 35–43, 35–44, 4–44). Moreover, under HUD's own equal opportunity determination, Morton Addition, a project located in a Black racially impacted area of Philadelphia, was to be built only if construction proceeded with the Whitman Park Townhouse Project, which HUD determined met the equal opportunity guidelines. Morton Addition was built while Whitman, a project which would have furthered integration in Philadelphia, was not built. In short, HUD heeded the suggestion from Washington to keep a "low profile" in the dispute after the Rizzo Adminis-

tration wrote its letter criticizing HUD to a member of President Nixon's White House staff. (N.T. 12–30 to 12–33, 45–21, 45–22). Keeping a "low profile" is not in keeping with the affirmative duty specifically placed upon HUD by the Fair Housing Act of 1968. *Shannon v. HUD*, 436 F.2d 809 (3d Cir. 1970). HUD failed to use the resources of the federal government in an effort to have the Whitman Park Townhouse Project constructed. We find that HUD has not met its affirmative obligation under 42 U.S.C. § 3608(d)(5).

### b) *Racial Effect*

■ Plaintiffs contend that proof that the action of the governmental defendants had a racially discriminatory effect, makes out a prima facie case of a violation of Title VIII of the Civil Rights Act of 1968 and thereby shifts the burden to the defendants to show a compelling governmental interest justifying their action. Prior to, and during the trial of this case, plaintiffs also contended that proof of governmental actions having a racially discriminatory effect would likewise establish a cause of action under the Fifth, Thirteenth and Fourteenth Amendments as well as 42 U.S.C. §§ 1981 and 1983. However, in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed. 597 (1976), the Supreme Court held that a disproportionate racial effect was not sufficient by itself to establish a constitutional violation under the Equal Protection Clause in an employment discrimination case. The Supreme Court distinguished Title VII liability and the standard of proof thereunder, from the standard of proof required to establish a constitutional violation, under which the plaintiffs were required to show a discriminatory purpose on the part of the defendants. Plaintiffs have conceded that the holding of *Washington* requires them to abandon their contention that disproportionate racial effect is sufficient to establish a prima facie case in connection with the constitutional violations they alleged. *See*

59. The failure of PHA to proceed on its own with the Whitman Park Townhouse Project may be strong evidence that the support of the

City Administration is required for a housing program to proceed.

*Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2050, 48 L.Ed.2d 597 (1976). We agree with the plaintiffs, however, that the prima facie case concept applicable to cases brought pursuant to Title VII of the Civil Rights Act of 1964 is for the reasons hereinafter discussed, applicable to violations of Title VIII of the 1968 Act.[60]

■ The Fair Housing Act proscribes a wide range of discriminatory housing practices by both public and private parties. These acts range from a party's outright refusal to rent or sell on the basis of race to discrimination in terms and conditions of housing which will "otherwise make unavailable or deny" a dwelling on racial grounds. *See* 42 U.S.C. §§ 3604(a), 3604(b), 3605, 3606. The Supreme Court has noted that "[t]he language of the Act is broad and inclusive" and requires a "generous construction." *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 212, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Lower Courts have also agreed that the Act is to be liberally construed in accordance with the national policy in favor of fair housing. *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 548 (W.D.Va.1975); *Zuch v. Hussey,* 394 F.Supp. 1028, 1047 (E.D. Mich.1975); *United States v. Real Estate Development Corp.,* 347 F.Supp. 776, 781 (N.D.Miss.1972). Moreover, it is well established that "civil rights statutes should be read expansively in order to fulfill their purpose." *Mayers v. Ridley,* 151 U.S.App. D.C. 45, 465 F.2d 630, 635 (1972) (Wright, J., concurring) citing *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 388 (1971). We have heretofore discussed the legislative history of the Act which shows that in enacting the Fair Housing Act, Congress was aware that its past attempts to end racial discrimination in housing had failed and that affirmative action

was required. Furthermore, the legislative history of the Fair Housing Act demonstrates that Congress was aware of the proof problems inherent in establishing racial intent. During debate on the Act, Senator Baker introduced an amendment which would have exempted from liability any homeowner who engaged a real estate agent "without indicating any preference, limitation or discrimination based on race . . . or an intention to make any such preference . . . ." 114 Cong.Record 5214. Senator Percy opposed the amendment stating that:

> If I understand this amendment, it would require proof that a single homeowner had specified racial preference. I maintain that proof would be impossible to produce. 114 Cong.Record 5216.

The amendment was rejected by the Senate.

Prior to the Supreme Court's recent decision in *Washington,* it was well established that the racial effect test was applicable to Title VIII of the Civil Rights Act of 1968. In *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), the Eighth Circuit held that Title VIII was designed to remove artificial barriers in housing and that proof of racial intent was not required under the Act. 508 F.2d at 1184. The court then stated that:

> The burden of proof in Title VIII cases is governed by the concept of the "prima facie case." To establish a prima facie case of racial discrimination the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was ra-

**60.** Nothing in *Washington* undermines the racial effect standard for Title VII cases enunciated in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *See* 426 U.S. 229, 96 S.Ct. 2040, 2047, n.10, 48 L.Ed.2d 597 (1976). In *Griggs,* Chief Justice Burger stated:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. 401 U.S. at 431, 91 S.Ct. at 853.

cially motivated. Effect, and not motivation, is the touchstone . . . .

Once the plaintiff has established a prima facie case by demonstrating racially discriminatory effect, the burden shifts to the governmental defendants to demonstrate that its conduct was necessary to promote a compelling governmental interest. 508 F.2d at 1184–1185. (Footnotes and citations omitted).

Earlier the same court, in *Williams v. Mathews Co.*, 499 F.2d 819 (8th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974) stated in connection with Title VIII that:

> The courts will look beyond the form of a transaction to its substance and proscribe practices which actually or predictably result in racial discrimination, irrespective of defendant's motivation. 499 F.2d at 826.

Other courts have held that the prima facie case concept applies to Title VIII and that effect and not motivation governs such cases. *United States v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 808 (5th Cir. 1974); *Barrick Realty, Inc. v. City of Gary*, 491 F.2d 161 (7th Cir. 1974); *United States v. Real Estate Development Corp.*, 347 F.Supp. 776, 782 (N.D.Miss.1972); *Zuch v. Hussey*, 394 F.Supp. 1028, 1047 (E.D.Mich. 1975); *United States v. Hughes Memorial Homes*, 396 F.Supp. 544, 548 (W.D.Va.1975). Likewise, in *Shannon v. HUD*, 436 F.2d 809 (1970), our Third Circuit stated that Title VIII required that HUD "look at the effects of local planning action . . . to prevent discrimination in housing resulting from such action." 436 F.2d at 816. These cases, read in light of the legislative history of Title VIII and its remedial purpose convince this Court that the racial effect test and the prima facie case concept continue applicable to actions brought pursuant to Title VIII of the Civil Rights Act of 1968.

An analysis of the facts relevant to this theory of liability in connection with the governmental defendants need not detain us long. As stated herein, there is no question that the actions of these defendants in terminating the Whitman Park Townhouse Project had a racially discriminatory effect. Our analysis in connection with this finding is found at page 1018 of this opinion and need not be repeated here. As pointed out herein, it is clear from this record that the actions of the City of Philadelphia, RDA and PHA in terminating the Whitman Park Townhouse Project, taken against the background of racial segregation in Philadelphia and in the PHA system, had a disparate racial effect. *Wright v. Council of City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

Having established that the actions of the City, RDA and PHA in terminating the Whitman Park Townhouse Project had a racially discriminatory effect, the burden shifted to the defendants to establish a compelling governmental interest which would justify such action. The only justification advanced by any party for the action taken by the defendants was that of the City. The City argued that its actions in terminating the project were required because of threatened violence. The United States Supreme Court has consistently held that threats of violence or unrest by some citizens cannot justify depriving those of minority background of their constitutional rights. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). "Citizens may not be compelled to forego their constitutional rights because officials fear public hostility . . . ." *Palmer v. Thompson*, 403 U.S. 217, 226, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438 (1971) (dictum). *See Wright v. Georgia*, 373 U.S. 284, 293, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1916). Moreover, we note the excellent record that the Civil Disobedience Unit of the Police Department of the City of Philadelphia has established in connection with potential disruptions of the peace. Indeed, in this case Inspector Fencl, the able head of the Civil Disobedience Unit, testified that the Philadelphia Police Department could control any disturbance in connection with the

Whitman Park Townhouse Project and could have seen that construction was completed. (N.T. 49–146, 49–147).

■ We find that the plaintiffs have established that the actions of the City of Philadelphia, RDA and PHA had a racially discriminatory effect which was not justified by any compelling governmental interest, and constitute a violation of Title VIII of the Civil Rights Act of 1968.

c) *Racial Intent*

■ It is, of course, beyond question that the denial of housing with a racial purpose or motivation is illegal. If such racially motivated actions are taken by an official of a governmental body, those actions violate the Thirteenth and Fourteenth Amendments as well as 42 U.S.C. §§ 1981 and 1982. Further, a governmental agency which denies housing on the basis of race violates 42 U.S.C. § 2000d *et seq.*, and 42 U.S.C. § 3601 *et seq.* Private action denying housing on the basis of race violates 42 U.S.C. §§ 1981 and 1982. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed. 1189 (1968); *Gatreaux v. Chicago Housing Authority,* 296 F.Supp. 907 (N.D.Ill.1969), aff'd, 436 F.2d 306 (7th Cir. 1970), *cert. denied,* 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971). Although it is not enough to establish racial discriminatory purpose to show solely that actions taken had a racially discriminatory impact, "disproportionate [racial] impact is [not] irrelevant" to prove an invidious discriminatory purpose which "may often be inferred from the totality of the relevant facts." *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2048, 2049, 48 L.Ed. 597 (1976). Mr. Justice Stevens, concurring in *Washington* states succinctly the role that proof of the ultimate consequences of actions plays in determining racial motivation:

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. 426 U.S. at 253, 96 S.Ct. at 2054.

With these principles in mind we will proceed to analyze the proof of racial motivation of WAIC and the City of Philadelphia.

1) *Whitman Area Improvement Council*

■ We find that the evidence does not support a finding that the opposition to the Whitman Townhouse Project by WAIC was substantially racial.[61] We make this finding, although we are well aware that many of the comments made by the demonstrators and picketers at the Whitman site and at WAIC meetings displayed racial bias toward the potential residents of the Whitman Park Townhouse Project. (N.T. 33–106, 33–118, 34–4, 34–6, 17–73, 49–126, 49–130, 21–10). At trial, some witnesses from the Whitman Area who were members of WAIC testified that they were opposed to the Whitman project because it would move Blacks into the neighborhood and would lead to mixed marriages. (N.T. 54–91, 54–92, 28–13, 28–14, 28–15, 28–85). Furthermore, we find that some of the reasons given by WAIC for its opposition to the Whitman Park Townhouse Project lack substance. *Banks v. Perk,* 341 F.Supp. 1175, 1178–79 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir. 1973). Early in the planning stages for

---

**61.** All residents within the boundaries of the Whitman Urban Renewal Area are members of WAIC.

the Whitman Park Townhouse Project, WAIC opposed the project because of its design. However, a special Amendment of Congress was passed to accommodate a change in design from high-rise to low-rise construction. After these changes were made, PHA and Multicon made other design changes, including back alleys, a change in windows for fire safety and creation of a recreation area, which met the objections of WAIC. WAIC also opposed the project because they felt that all housing projects were inherently unsafe and unsanitary. However, they presented no evidence to justify such a finding. Indeed, the Whitman Park Townhouse Project was sufficiently unique in its low-rise design and home-ownership features to destroy any generalization about all housing projects. Also, PHA agreed to allow a screening committee, which would include WAIC members, to screen the prospective occupants of the Whitman Townhouse Project. WAIC also opposed the project because persons with low incomes, making no down payments, would be able to live in homes allegedly more expensive than theirs, i. e., that those who were to live in the Whitman Park Townhouse Project were "getting something for nothing." This record reveals that the Whitman community received and accepted over $11 million in urban renewal funds and over $2.7 million in rehabilitation loans and grants over a ten-year period. (N.T. 2–21, 57–22). It is difficult to accept WAIC's purported opposition to low-income minority citizens receiving benefits, while they themselves were a leader in the nation in terms of funds given to an urban renewal area. (N.T. 20–17). Moreover, it is well established as a matter of law that in the area of economic and social welfare, a governmental body need not treat all groups identically so long as its distinctions are rationally based. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Finally, WAIC opposed the Whitman Park Townhouse Project because it claimed insufficient citizen participation by it in the decision to build. However, the evidence clearly establishes that WAIC participated in all stages of the Whitman Park Townhouse Project.

## 2) *The City of Philadelphia*

 It is clear from the testimony that certain officials of the City were aware of the existence of some racially motivated opposition to the Whitman Park Townhouse Project. The evidence is uncontradicted that Mayor Rizzo, both before and after taking office in January of 1972, considered public housing to be Black housing and took a stand against placing such housing in White neighborhoods. Further, the City must be charged with knowledge of the fact that, as pointed out herein, the cancellation of the Whitman Park Townhouse Project had an obvious disparate effect on the Black community and that the natural consequences of the action taken by the City would be to produce that disparate impact. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2054, 48 L.Ed. 597 (1976) (Stevens, J., concurring). Acting with such intent constitutes violation of the Thirteenth and Fourteenth Amendments and the Civil Rights statutes enumerated herein.

## *The Remedy*

The evidence in this case establishes that certain defendants have committed both constitutional and statutory violations in connection with the stoppage of construction of the Whitman Park Townhouse Project. As the facts outlined herein establish, this action was taken against a background of racial segregation both in the City of Philadelphia and in the housing system of PHA. The Whitman Park Townhouse Project would have been a step by the governmental defendants toward the desegregation of both the City of Philadelphia and the PHA system and would have been in conformance with the governmental defendants' statutory obligation under Title VIII to take affirmative action to achieve fair housing. Further, as set out herein, halting the Whitman Park Townhouse Project led to further segregation in the Whitman Area while perpetrating racial

segregation in Philadelphia and the PHA system.

 Federal District Courts have broad equitable powers to remedy constitutional violations. *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). We see no reason why these same equitable powers should not apply to violations of the affirmative duties imposed by the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.,* which was passed in part in an effort to enforce the Thirteenth and Fourteenth Amendments as well as the Commerce Clause of the U.S. Constitution, *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); 114 Cong.Record 2273. As stated by the United States Supreme Court in an oft-quoted citation:

> Once a right and violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

Indeed, when faced with a civil rights violation, a United States District Court has not merely the power but the duty to remedy the effects of past violations as well as bar similar violations in the future. *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). Of course, equitable powers may be exercised only on the basis of a found violation. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); but once a violation is found all reasonable methods are available to formulate an effective remedy to achieve the greatest possible degree of relief given the practicalities of the situation. *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976). Injunctive relief must be framed to remedy the wrong claimed by the party and narrowly tailored to remedy the specific harm shown. *Hartford-Empire Co. v. United States,* 323 U.S. 386, 410, 65 S.Ct. 373, 89 L.Ed. 322 (1945); *Davis v. Romney,* 490 F.2d 1360, 1370 (3d Cir. 1974).

In trying to formulate appropriate guidelines to guide United States District Courts in connection with the tailoring of equitable relief, the United States Supreme Court has stated that:

> [W]ords are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern . . .. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed. 554 (1971).

In housing discrimination cases the federal courts have consistently shown their willingness to exercise their broad equitable powers to remedy constitutional and statutory violations. *See, e.g., Dailey v. City of Lawton,* 425 F.2d 1037 (10th Cir. 1970) (order requiring the issuance of building permits); *Banks v. Perk,* 341 F.Supp. 1175 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir. 1973) (enjoining the City from planning or building any future public housing in Black neighborhoods); *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) (ordering defendants to submit a comprehensive plan to remedy the segregated public housing system in the City of Chicago); *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (permanent injunction restraining officials from enforcing a zoning ordinance which had precluded the building of low and moderate income housing project); *Garrett v. City of Hamtramck,* 335 F.Supp. 16 (E.D.Mich.1971), *aff'd in part and rev'd in part,* 503 F.2d 1236 (6th Cir. 1974).

 In fashioning appropriate equitable relief in this case, the Court does not wish to become a "housing czar" in the City of Philadelphia, nor does it intend to appropriate the role of the legislative bodies whose proper function it is to pass legislation and establish local policy in connection with public housing. It is not the Court's intention to inject itself into the internal affairs of the defendants by controlling low-income public housing in Philadelphia. We are

well aware of the Supreme Court's admonition in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 607 (1976), that "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" Where injunctive relief is sought, the principles of equity, comity and federalism must restrain a federal court where the injunctive relief is sought against those in charge of the executive and legislative branch of local government such as the defendants in this case. 96 S.Ct. at 608.

The plaintiffs in this case have asked this Court to order the defendants to build the Whitman Park Townhouse Project as planned. The defendants, however, have argued that the project should not be built as planned but that, if this Court finds liability, it should order the defendants to spend the funds initially appropriated for construction of the project on "scattered site" housing in the City of Philadelphia. They have presented convincing arguments that scattered site housing will be more effective than the traditionally large housing project in accomplishing racial integration. Apparently, the City of Philadelphia now has a policy of obtaining scattered sites and rehabilitating them for public housing rather than building the traditionally large public housing project. Although the Court is inclined to agree that "scattered site" housing may be more effective in accomplishing racial integration than a large public housing project, we are of the opinion that on the basis of this record the Court must order the building of the Whitman Park Townhouse Project as originally planned.

Where specific projects have been planned, and racial discriminatory conduct has precluded the development of the project, the courts have consistently enjoined the discriminatory conduct and ordered the project built. For example, in *U. S. v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), the Court held that under Title VIII of the 1968 Fair

Housing Act a local ordinance had a racially discriminatory effect in preventing a low and moderate income housing project in a White area from being built. The Court enjoined the enforcement of the ordinance so the planned project could be built. In *Dailey v. City of Lawton,* 425 F.2d 1037 (10th Cir. 1970), the Circuit Court affirmed the district court's order requiring a building permit to be issued so that a low income housing project could be built. The district court had found that the denial of the building permit for a housing project in a White area was racially discriminatory and ordered that this bar to the project (denial of permit) be removed in order for the project to be built. In *Banks v. Perk,* 341 F.Supp. 1175 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir. 1973), the district court held that the revocation of building permits for the building of public housing projects in White areas was racially discriminatory and ordered the issuance of "all necessary building permits to enable the prompt commencement of construction of the planned public housing units." *Banks, supra,* 341 F.Supp. at 1180. Moreover, in *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach,* 493 F.2d 799 (5th Cir. 1974), the court held that the City of Delray Beach's refusal to allow a proposed low-income housing project to tie into its existing water and sewer systems was racially discriminatory and ordered the City to allow the project to tie into the water system so that the housing project could proceed. In each of the above cases, a planned low or moderate income housing project was stopped in its planning stages because of a zoning ordinance, a refusal to grant building permits and a refusal to be allowed to be tied into a water line. In each case, the court found the impediment to the project to be racially discriminatory and ordered it to be removed so that the project could be built.

■ It was the failure of the defendants to build the Whitman Park Townhouse Project and the defendants' actions in con-

nection therewith which we have found to be in violation of the Constitution and Title VIII of the Civil Rights Act of 1968. Such violations empower this Court to order the defendants to immediately proceed with the construction of the Whitman Park Townhouse Project.

The building of the Whitman Park Townhouse Project will, at a minimum, lead to the re-establishment of the racial balance which existed in the Whitman area prior to the clearance which took place by both PHA and RDA in connection with the planning of the Whitman Park Townhouse Project and the Whitman Urban Renewal Area. As noted herein, prior to the clearance by PHA and RDA, the area set aside for the Whitman Park Townhouse Project was fairly well integrated, but because of the clearance, the area became more segregated. In light of the present racial composition of public housing in Philadelphia and the waiting list for public housing, building the project as proposed can be expected to re-establish the racial balance in the area of the Whitman project.

The proposed Whitman Park Townhouse Project has many characteristics which make it unique and are designed to avoid the problems which have accompanied the traditional housing project. First, the proposed project is of a low-rise townhouse design with a low density for a public housing project. Such design will fit comfortably in the context of the surrounding area, which is predominantly row houses of similar design. Also, the project is designed so that the occupants can eventually obtain ownership of their homes. This unique feature is designed to encourage proper maintenance and care of the units which have been problems in the traditional high-rise project.

There was testimony concerning the potential racial composition of the Whitman Park Townhouse Project. All parties stated their concern that the Whitman Park Townhouse Project should not have an all-Black population which would create an island of Black people surrounded by a sea of White people. It is for this reason that all the parties in this litigation have suggested that the project should be integrated. Indeed, the experts testifying for both plaintiffs and defendants agreed that the occupancy of the Whitman Park Townhouse Project should not be overwhelmingly Black. (N.T. 41–98, 41–99, 52–128, 52–129, 53–82).

We find that the present policies of PHA which it characterizes as a "freedom of choice" plan have not only failed to accomplish integration but have perpetuated racial segregation. The Court will therefore order PHA to submit a proposal concerning the racial composition for the Whitman Park Townhouse Project when constructed, together with a plan which will further integration in all public housing projects within the City of Philadelphia.

The plaintiffs have asked this Court to order the governmental defendants to provide all necessary funds to complete the original project as planned. The delay in building the project has, in all probability, increased the cost of its construction. The original reservation of funds may well be inadequate to complete construction. Since the delay is the result of the unlawful actions of the defendants, the plaintiffs should not suffer a decrease in the number of housing units originally planned. This Court shall order the defendants to take all necessary steps to build the project as originally planned by using the funds now held in reserve by HUD and providing such additional funds as may be necessary.

Finally, plaintiffs have asked this Court to order the defendants to pay attorneys' fees arising out of this litigation. While plaintiffs may be entitled to an award of attorneys' fees the issue has not been briefed. See, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Skehan v. Board of Trustees of Bloomsburg State College, 538 F.2d 53 (3d Cir. 1976). Furthermore, plaintiffs have not submitted evidence in connection with reasonableness of any fees claimed. Lindy Bros. Builders,

*Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973); *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 109 (1975).

This Memorandum and Order is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Accordingly, the following Order is entered:

## ORDER

AND NOW, this 5th day of November, 1976, it is hereby ORDERED as follows:

(1) The defendants Philadelphia Housing Authority, Redevelopment Authority for the City of Philadelphia, City of Philadelphia, Department of Housing and Urban Development, their officers, agents, and employees shall immediately take all necessary steps for the construction of the Whitman Park Townhouse Project as planned.

(2) PHA shall submit to this Court within ninety days a plan for the racial composition of the Whitman Park Townhouse Project.

(3) PHA shall present to this Court within ninety days a plan concerning the tenanting of all public housing projects within the City of Philadelphia which will further racial integration.

(4) All parties to this litigation are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project.